# Amanda Brigham, et al. v. State of Vermont

[692 A.2d 384]

No. 96-502

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed February 5, 1997

*Robert A. Gensburg*, St. Johnsbury, *Joshua Diamond* of *Diamond & Associates, P.C.*, Montpelier, *Franklin L. Kochman* of *Kochman & Smith*, Burlington, *Mitchell L. Pearl* of *Langrock Sperry & Wool*, Middlebury, *David Putter* of *Saxer Anderson, Wolinsky & Sunshine PC*, Montpelier, and *Peter Welch* of *Welch, Graham & Manby*, White River Junction, for Plaintiffs-Appellees.

*Jeffrey L. Amestoy*, Attorney General, and *Geoffrey A. Yudien* and *Ronald A. Shems*, Assistant Attorneys General, Montpelier, for Defendant-Appellant.

■ **Per Curiam.** In this appeal, we decide that the current system for funding public education in Vermont, with its substantial dependence on local property taxes and resultant wide disparities in revenues available to local school districts, deprives children of an equal educational opportunity in violation of the Vermont Constitution. In reaching this conclusion, we acknowledge the conscientious and ongoing efforts of the Legislature to achieve equity in educational financing and intend no intrusion upon its prerogatives to define a system consistent with constitutional requirements. In this context, the Court's duty today is solely to define the impact of the State Constitution on educational funding, not to fashion and impose a solution. The remedy at this juncture properly lies with the Legislature.

When we consider the evidence in the record before us, and apply the Education and Common Benefits Clauses of the Vermont Constitution to that evidence, see Vt. Const. ch. I, art. 7 and ch. II, § 68, the conclusion becomes inescapable that the present system has fallen short of providing every school-age child in Vermont an equal educational opportunity. This duty was eloquently described in *Brown v. Board of Education*, 347 U.S. 483, 493 (1954):

[E]ducation is perhaps the most important function of state and local governments. . . . It is required in the performance of our most basic public responsibilities . . . . It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity,

where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

## I. PROCEDURAL HISTORY

This declaratory judgment action against the State of Vermont was filed in the Lamoille Superior Court by three sets of plaintiffs alleging both distinct and overlapping claims: (1) two students from the Whiting and Hardwick School Districts, respectively, who claimed that the State's method of financing public education deprived them of their right under the Vermont and federal constitutions to the same educational opportunities as students who reside in wealthier school districts; (2) several property owners from "property poor" school districts, who claimed that the current school financing scheme compels them to contribute more than their just proportion of money to fund education, in violation of these constitutions; and (3) two school districts, Brandon and Worcester, which claimed that the current financing scheme deprives them of the ability to raise sufficient money to provide their students with educational opportunities equal to those afforded students in wealthier school districts, and compels them to impose disproportionate tax rates in violation of the United States and Vermont Constitutions.

In response to the State's motion for summary judgment, the trial court ruled that plaintiffs' claims predicated on the federal constitution were barred by the United States Supreme Court decision in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), which held that there is no fundamental right to an education under the United States Constitution, that state education-funding schemes are therefore subject only to "rational basis" scrutiny under the Equal Protection Clause of the Fourteenth Amendment, and that interdistrict funding disparities are rationally related to the legitimate state purpose of fostering local control over education funding and programs. *Id.* at 37, 44, 48-49, 55. Although the *Rodriguez* Court conceded that "some identifiable quantum of education" might deserve constitutional protection to ensure the "basic minimal skills necessary" for the exercise of free speech rights and participation in the political process, *id.* at 36-37, plaintiffs here have not alleged that public education in Vermont is fundamentally inadequate or fails to impart minimal basic skills.

The trial court also rejected plaintiffs' claim that Chapter II, § 68 of the Vermont Constitution establishes a fundamental right to education. That provision, in relevant part, provides:

> Laws for the encouragement of virtue and prevention of vice and immorality ought to be constantly kept in force, and duly executed; and a competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth.

Vt. Const. ch. II, § 68.

Plaintiffs alleged that the constitutional language, the case law, and the history of Vermont establish that this provision guarantees a fundamental right to education, and by extension a right to equal educational opportunities, and that the current funding disparities must, therefore, be strictly scrutinized under the Common Benefits Clause of the Vermont Constitution.[1] The State must demonstrate, in other words, that the current financing scheme advances a compelling governmental interest and is narrowly tailored to serve that interest. *Veilleux v. Springer*, 131 Vt. 33, 40, 300 A.2d 620, 625 (1973). The trial court rejected this argument, ruling that § 68 does not provide "*any* rights . . . to Vermont citizens." Accordingly, the court granted judgment for the State with respect to the claims predicated on § 68.

The court denied summary judgment as to plaintiffs' remaining claims that (1) the current educational financing system was not rationally related to a legitimate governmental purpose, and therefore violated the right to equal protection of the laws under Chapter I, Article 7, see *Choquette v. Perrault*, 153 Vt. 45, 52, 569 A.2d 455, 459 (1989) ("when no fundamental right or suspect class is involved, state law need only reasonably relate to a legitimate public purpose"), and (2) it compelled the taxpayer-plaintiffs to contribute disproportionate sums to fund education, in violation of their rights under Chapter I, Article 9.[2] In explaining its decision to deny summary judgment on these claims, the court stated that it was "unclear" whether the parties agreed on precisely what constitutes equal educational opportunities, or how the relative wealth of a district affects those

---

[1] That section, in pertinent part, provides: "That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community . . . ." Vt. Const. ch. I, art. 7.

[2] That section, in part, provides: "That every member of society hath a right to be protected in the enjoyment of life, liberty, and property, and therefore is bound to contribute the member's proportion towards the expence of that protection . . . ." Vt. Const. ch. I, art. 9.

opportunities. It consequently set the case for trial to develop a factual record.

The parties moved jointly for permission to appeal the judgment except for that portion disposing of plaintiffs' federal equal protection claims. See V.R.A.P. 5(a). The trial court denied the motion. The parties thereupon renewed their motion with this Court, and we granted the motion. See V.R.A.P. 5(b)(1).

## II. FACTS

■ In our view the material facts are not in dispute. Public schools in Vermont are financed principally by two means: funds raised by cities and towns solely through assessments on property within them, as authorized by 16 V.S.A. § 511, and funds distributed by the state under a complex aid formula, currently known as the Foundation Plan. See *id.* §§ 3441-3449. The purpose of a foundation formula is to enable each school district to spend an amount per pupil that will provide at least a minimum-quality education program, known as the foundation cost. See *id.* §§ 3492-3494; see generally A. Odden & L. Picus, *School Finance: A Policy Perspective* 173-82 (1992). In Vermont this is the amount necessary for elementary students to receive an education that complies with public school approval standards. See 16 V.S.A. § 3492. To enable the formula to work, the Legislature annually establishes a foundation tax rate as a reasonable rate of local property taxation to raise the foundation cost. See *id.* § 3495(a). Basically, state aid is calculated as the difference between the foundation cost for all students in a district and the amount the district can raise itself at the foundation tax rate. See *id.* § 3497(a).

There are a number of adjustments to this basic formula that generally reduce its equalizing effect. Further, a substantial amount of state financing of education is supplied through categorical grant programs based on different distribution formulas which may not reflect the ability of a school district to raise money itself.[3] For example, the state funds all of the employers' share of teachers'

---

[3] A recent study of educational finance reform reported that for fiscal year 1993 the grant allocations were as follows:

| | |
|---|---|
| General State Aid — | $140,263,372 |
| Special Education — | $ 44,243,446 |
| Teachers' Retirement | $ 19,000,000 |
| Adult and Vocational Education — | $ 7,320,722 |

retirement pensions for all districts, irrespective of the ability of a district to pay those costs.

From an equity standpoint, the major weakness of a foundation formula distribution system is that it equalizes capacity only to a level of a minimally adequate education program. Odden & Picus, *supra*, at 175. Vermont has adopted a limited ability for districts to receive some assistance with costs above foundation costs, primarily to help with debt service from capital construction projects. See 16 V.S.A. §§ 3441(9), (16), 3497(d). School districts with greater property wealth, however, can more easily spend above foundation costs to improve education, and the record before us shows that they usually make these expenditures. Thus, a foundation-formula, state-aid program can boost the capacity of the poorest districts, but still leave substantial deficiencies in overall equity. See Odden & Picus, *supra*, at 175-77. Many of the states in which the highest court has held that the educational financing system does not meet constitutional minimums had foundation state-aid programs in effect at the time of the decision. See *Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 877 P.2d 806, 809-10 (Ariz. 1994); *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 143, 156 (Tenn. 1993); *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 392, 397 (Tex. 1989).

Although the foundation state-aid plan was adopted fairly recently, the criticism of it has grown in recent years.[4] It is, however, well beyond our limited role to evaluate the imperfections in the state-aid formula. Even if we are to assume that it is working adequately to accomplish its purpose, we must confront the constitutionality of the system in light of the limited nature of the Foundation Plan's purpose. The object of the Plan is not equality of educational opportunity

| Basic Education — | $ 1,259,193 |
| School Construction - | $ 8,250,000 |
| Other — | $ 953,284 |
| Total — | $222,180,065 |

Governor's Blue Ribbon Commission on Educational and Municipal Financing Reform: Final Report and Recommendations 12 (1993). Although appropriations have changed since 1993, the basic proportions appear to be similar. If anything, the proportion provided by basic state aid has decreased, with only 145 million dollars appropriated in fiscal year 1997. See 1995, No. 178 (Adj. Sess.), § 173. Some equalization of funding has been introduced into the formulas for school construction aid, see 16 V.S.A. § 3448(a)(7), and special education aid, see *id.* § 2963(c)(3).

[4]The criticism of the Foundation Plan, like that of all the plans before it, follows a predictable cycle. See Governor's Blue Ribbon Commission on Educational and Municipal Financing Reform: Final Report and Recommendations 11, 15 (1993).

generally, or even equality of local capacity to facilitate opportunity. It is only to equalize capacity to produce a minimally adequate education, assuming the voters can sustain the state-selected tax rate.

That the foundation formula does not eliminate wealth disparities is shown dramatically by the record before us. Notwithstanding the fact that state aid has increased substantially in recent years, the percentage of the local contribution to education revenues has remained exceptionally high. In fiscal year 1994, public education revenues raised through local property taxes represented over 60% of the total cost of public education, one of the highest local shares in the nation. Furthermore, notwithstanding the considerable financial commitment by the state, there remain wide differences among school districts in per-pupil spending. At the extremes, in fiscal year 1995 the Town of Eden spent $2979 per student, compared with the Town of Winhall, which spent $7726, or 160% more than Eden.[5] In December 1994, the top 5% of school districts spent from $5812 to $7803 per student, while the bottom 5% spent from $2720 to $3608. Thus, some school districts in Vermont commonly spend *twice* as much or more per student as other districts.

The correlation between spending disparities and taxable property wealth within the districts is also well established. As summarized in a recent Department of Education analysis of school financing during fiscal year 1995, "A statistically significant relationship exists between [the] wealth of a school district and its spending per student. Based largely on this relationship, there continue[] to be large disparities in per pupil spending across school districts." Vermont Department of Education, A Scorecard for School Finance FY 95, at i (1996). The data dramatically bear this out. In fiscal year 1995, for example, the Town of Richford's property tax base was approximately $140,000 per student, second lowest in the state, and its average student expenditure was also among the lowest at $3743. By contrast, the Town of Peru enjoyed a tax base of approximately $2.2 *million* per student, and its per-pupil expenditure was $6476. Of course, property wealth

---

[5]The data summarized in this opinion were compiled by the Vermont Department of Education and published in yearly "Scorecards for School Finance" and other documents. The student-expenditure figures reflect the current expense (CE) per average daily membership (ADM) of the school district; it excludes local construction, transportation and special education costs. 16 V.S.A. § 3441(1), (8). The wealth-per-student figures reflect the fair market value of property in the district, or equalized grand list (EGL), over the average daily membership. *Id.* § 3441(20). The effective tax rate is a measure used by the Department of Education to compare school tax rates in different districts.

does not invariably correlate with student expenditures. Stannard's property tax base in fiscal year 1995 was somewhat over $118,000 per student, compared with Sherburne's of $2.5 million. Notwithstanding the vast disparity in property wealth, Stannard's average expenditure per pupil, $5684, was nearly equal to Sherburne's of $5731. Not surprisingly, however, there was a huge disparity in their effective tax rates: on an $85,000 home, the tax in Sherburne was $247; in Stannard, it was $2040. It is thus readily apparent, as the Department of Education has noted, "that spending per pupil . . . tends to be highest in resource-rich districts who benefit further with low school tax rates . . . [while] [c]onversely, towns with limited resources spend less per student [and] pay higher tax rates." *Id.* at 11.

The undisputed evidence thus amply supports plaintiffs' claim that wide disparities in student expenditures exist among Vermont school districts and that these disparities correlate generally with taxable property wealth within the districts. The record is relatively less developed with respect to plaintiffs' further assertion that funding disparities result in unequal educational opportunities, and specifically that "[c]omparatively low expenditures for education cause comparatively diminished educational opportunities for the students attending the affected schools." The essential point, however, is undisputed. The trial court noted the State had "concede[d] that the present funding scheme denies children residing in comparatively property-poor school districts the same 'educational opportunities' that are available to students residing in wealthier districts." The State has not only failed to challenge this finding, it affirmatively relies on it to demonstrate that, contrary to the judgment of the court below, no genuine issue of material fact remains to be resolved at trial.

Having conceded that the current funding system fails to afford Vermont schoolchildren equal educational opportunities, it is immaterial — the State contends — whether the parties agree on the precise nature of the educational "opportunities" affected by the disparities. Indeed, in their oral arguments before this Court the parties assumed that unequal funding yields, at a minimum, unequal curricular, technological, and human resources. School districts of equal size but unequal funding would not have the capacity, for example, to offer equivalent foreign language training, purchase equivalent computer technology, hire teachers and other professional personnel of equivalent training and experience, or provide equivalent salaries and benefits.

In this respect the State concedes the obvious. While we recognize that equal dollar resources do not necessarily translate equally in

effect, there is no reasonable doubt that substantial funding differences significantly affect opportunities to learn. To be sure, some school districts may manage their money better than others, and circumstances extraneous to the educational system may substantially affect a child's performance. Money is clearly not the only variable affecting educational opportunity, but it is one that government can effectively equalize.

## III. DISCUSSION

■ We now turn to the chief contention of this dispute, namely whether the disparities in educational opportunities outlined above violate Vermont law. We find the law to be unambiguous on this point. Whether we apply the "strict scrutiny" test urged by plaintiffs, the "rational basis" standard advocated by the State, or some intermediate level of review, the conclusion remains the same; in Vermont the right to education is so integral to our constitutional form of government, and its guarantees of political and civil rights, that any statutory framework that infringes upon the equal enjoyment of that right bears a commensurate heavy burden of justification. The State has not provided a persuasive rationale for the undisputed inequities in the current educational funding system. Accordingly, we conclude that the current system, which concededly denies equal educational opportunities, is constitutionally deficient.

■ We are cognizant that, in so holding, we do not write on an entirely blank slate. Numerous state courts have in recent years considered constitutional challenges to locally funded educational systems. Some have declared property-tax-based systems similar to Vermont's to be unconstitutional. See P. Enrich, *Leaving Equality Behind: New Directions in School Finance Reform*, 48 Vand. L. Rev. 101, 102 n.5 (1995) (collecting cases). Almost without exception, these cases have held that education is an important or fundamental right under the applicable state constitution and that gross funding inequities resulting from interdistrict property-wealth disparities violate a constitutional right to equal educational opportunity. See, e.g., *Edgewood*, 777 S.W.2d at 397 ("Children who live in poor districts and children who live in rich districts must be afforded a substantially equal opportunity to have access to educational funds."); *Washakie County Sch. Dist. No. 1 v. Herschler*, 606 P.2d 310, 336 (Wyo.) ("We . . . proscribe any system which makes the quality of a child's education a function of district wealth."), *cert. denied*, 449 U.S. 824

(1980); *Dupree v. Alma Sch. Dist. No. 30*, 651 S.W.2d 90, 93 (Ark. 1983) ("For some [school] districts to supply the barest necessities and others to have programs generously endowed does not meet the requirements of the constitution."). Other state courts have upheld the constitutionality of their education financing systems despite wide interdistrict funding disparities, generally concluding that they promote local control of education, see, e.g., *Lujan v. Colorado State Bd. of Educ.*, 649 P.2d 1005, 1023 (Colo. 1982), or warrant judicial scrutiny only upon a showing of "gross . . . inadequacy." *Board of Educ. v. Nyquist*, 439 N.E.2d 359, 369 (N.Y. 1982), *appeal dismissed*, 459 U.S. 1138-39 (1983); see also Enrich, *supra*, at 102 n.5 (collecting cases).

Although informative, all of these cases are of limited precedential value to this Court because each state's constitutional evolution is unique and therefore incapable of providing a stock answer to the specific issue before us.[6] Similarly inapposite is the United States Supreme Court's ruling in *Rodriguez*, which was based on the virtual absence in the United States Constitution of an education clause, as well as considerations of federalism, which understandably deterred the Court from defining educational rights applicable in all fifty states. 411 U.S. at 33-35, 40-44. Neither constraint is applicable to this Court. An understanding of the constitutional issue presented requires, rather, a review of the specific historical and legal origins of the right to education in Vermont.

---

[6] It is, of course, appropriate to consider sister-state interpretations of constitutional provisions similar to Vermont's. See *Benning v. State*, 161 Vt. 472, 476, 641 A.2d 757, 759 (1994). Unlike the education clauses in most other states, which can generally be classified in one of several categories according to their operative language, the education clause set forth in Chapter II, § 68 of the Vermont Constitution is unique. See G. Ratner, *A New Legal Duty for Urban Public Schools: Effective Education in Basic Skills*, 63 Tex. L. Rev. 777, 814-16 (1985) (describing four general categories of state education clauses). The original education clause in the Vermont Constitution of 1777 was derived from a provision in the Pennsylvania Constitution of 1776. The Pennsylvania provision was subsequently amended, however, and no longer resembles Vermont's clause in any respect. See *Danson v. Casey*, 399 A.2d 360, 362 n.2 (Pa. 1979). Perhaps the closest education clause textually to Vermont's is Connecticut's, which provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." Conn. Const. art. VIII, § 1. In *Horton v. Meskill*, 376 A.2d 359 (Conn. 1977), the Connecticut Supreme Court held that this provision created a fundamental right to education, "that pupils in the public schools are entitled to the equal enjoyment of that right," and that inequities in education funding resulting from interdistrict wealth disparities failed to advance a sufficiently compelling state interest. *Id.* at 374.

## A. The Right to Education in Vermont

From its earliest days, Vermont has recognized the obligation to provide for the education of its youth. That obligation begins with the Education Clause in the Vermont Constitution. A provision for the establishment of public schools was contained in the first Vermont Constitution of 1777. That section, in part, provided: "A school or schools shall be established in each town, by the legislature, for the convenient instruction of youth . . . ." Vt. Const. of 1777, ch. II, § 40. The clause was amended in 1786 as part of a comprehensive constitutional revision. The amendment modified the language of the section and combined it with the so-called "Virtue" Clause which followed the Education Clause in the original Constitution, to read as follows: "Laws for the encouragement of virtue, and prevention of vice and immorality, ought to be constantly kept in force, and duly executed: and a competent number of schools ought to be maintained in each town, for the convenient instruction of youth . . . ." Vt. Const. of 1786, ch. II, § 38. This amended version roughly corresponds with the education clause in Chapter II, § 68 of our current Constitution.

Two points are striking about this constitutional provision. First and foremost is its very existence. It is easy to forget from the perspective of two centuries the daunting task that confronted the creators of Vermont's initial government and law. They were compelled to create an entirely new Constitution setting forth, at a minimum, a declaration of fundamental human rights and a basic frame of government. The fact that they chose, in this statement of first principles, to include a right to public education — particularly in light of the relative paucity of state-supported public schools in existence at the time — is remarkable.

The important point is not simply that public education was mentioned in the first Constitution. It is, rather, that education was the *only* governmental service considered worthy of constitutional status. The framers were not unaware of other public needs. Among the first statutes enacted by the General Assembly in 1779 were two separate acts for the maintenance and support of the poor and infirm. One, entitled "An Act for Relieving and Ordering Idiots, Impotent, Distracted and Idle Persons," specifically required towns to "make necessary provision for the relief, support and safety" of persons who, because of "[p]rovidence . . . age, [or] sickness," were "uncapable to provide for themselves." Acts and Laws of Vermont 1779, at 15-16. The other statute, entitled "An Act for Maintaining and Supporting the Poor," required towns to "take care of, support, and maintain their

own poor," *id.* at 97, giving rise to what has euphemistically been called "poor farms."

Despite the obvious public concern for those least able to care for themselves, the framers made no provision in the Constitution for public welfare or "poor relief" as it was then known. Indeed, many essential governmental services such as welfare, police and fire protection, transportation, and sanitation receive no mention whatsoever in our Constitution. Only one governmental service — public education — has ever been accorded constitutional status in Vermont.

■ The Education Clause is also instructive in what it does not provide. Although it requires that a school be maintained in each town unless the Legislature permits otherwise, it is silent on the means of their support and funding. The Legislature has implemented the education clause by authorizing school districts to raise revenue through local property taxes. But neither this method, nor any other means of financing public education, is constitutionally mandated. Public education is a constitutional obligation of the state; funding of education through locally-imposed property taxes is not.

An examination of the Education Clause in its historical context proves enlightening, as well. Vermont did not exist as a political entity prior to 1777. Before the Revolution, the territory was known as the Hampshire Grants and was torn by the competing claims of New Hampshire and New York. It was occupied by an amalgam of settlers from neighboring colonies whose loyalties often lay elsewhere. See G. Aichele, *Making the Vermont Constitution: 1777-1824*, 56 Vt. Hist. 166, 167 (1988); *State v. Elliott*, 159 Vt. 102, 112-13, 616 A.2d 210, 216 (1992), *cert. denied*, 507 U.S. 911 (1993). This changed dramatically in 1777, when the people of Vermont, emboldened by events in the colonies, issued their own declaration of independence, created the independent Republic of Vermont, and adopted their own constitution. "Thus Vermont became the first self-created state." *Records of the Council of Censors of the State of Vermont* 1 (P. Gillies & D. Sanford eds., 1991). It was not until 1791 that Vermont would enter the union as the fourteenth state.

With the formal creation of the Vermont Republic all of the institutions of self-government that had long existed in the original thirteen colonies had to be created anew. More important, all of the habits and *values* of a self-governing people had to be freshly invigorated and reinforced. As one historian of this period observed, "The creators of Vermont . . . could not appeal to a colonial past . . . . [T]he new state's leaders had to convince not only the 'powers

of the earth,' but also the people of Vermont and themselves, that they were entitled to statehood." P. Onuf, *State-Making in Revolutionary America: Independent Vermont as a Case Study*, 67 J. Am. Hist. 797, 802 (1981).

Thus, for the founders of the frontier Republic of Vermont the fostering of republican values, or public "virtue" as it was commonly known in the eighteenth century, was not the empty rhetoric it often seems today; it was an urgent necessity — a matter literally affecting the survival of the new Republic. This urgency was reflected in the Constitution, one provision of which instructed that "frequent recurrence to fundamental principles, and a firm adherence to justice, moderation, temperance, industry and frugality, are absolutely necessary to preserve the blessings of liberty." Vt. Const. of 1777, ch. I, art. 16. Another constitutional provision, the so-called "Virtue" Clause, declared that "[l]aws for the encouragement of virtue, and prevention of vice and immorality, shall be made and constantly kept in force." *Id.* ch. II, § 41. Republican theory of the eighteenth century held that public "virtue" — in the broad sense of moral restraint, public responsibility, and ethical values — was the bedrock and essential ingredient of self-government. See G. Wood, *The Creation of the American Republic, 1776-1787* 68 (1969) ("The eighteenth century mind was thoroughly convinced that a popularly based government 'cannot be supported without *Virtue*.'"). As John Adams wrote, "'Liberty' . . . 'can no more exist without virtue and independence than the body can live and move without a soul.'" B. Bailyn, *The Ideological Origins of the American Revolution* 135 (1992) (quoting John Adams).[7]

In 1786, as noted, the Virtue and Education Clauses were combined to form a single section. Nothing could be more indicative of the close connection in the minds of the framers between *virtue* and all that that implied — civic responsibility, ethical values, industry, self-restraint — and public *education* than this textual union within the Constitution. No explanation for the 1786 modification survives, but the logical connection is self-evident. The amalgamation was perfectly consistent with the commonly held view of the framers that virtue was essential to self-government, and that education was the primary source of virtue. In a "history" of Vermont published several years

---

[7]There is an extensive historical literature discussing the centrality of "virtue" in eighteenth century republican theory. See, e.g., B. Bailyn, *The Ideological Origins of the American Revolution* 344, 351-52, 368-75 (1992); J. Burns, *The Vineyard of Liberty* 62-63 (1982); G. Wood, *The Creation of the American Republic, 1776-1787* 65-70 (1969).

after its founding, Ira Allen, youngest brother of Ethan Allen and a storied figure in his own right, explained the relationship as follows:

> The greatest legislators from Lycurgus down to John Lock[e], have laid down a moral and scientific system of *education as the very foundation and cement of a State;* the Vermonte[rs] are sensible of this, *and for this purpose they have planted several public schools, and have established a university, and endowed it with funds . . . to draw forth and foster talents.* The effects of these institutions are already experienced, and I trust that in a few years the rising generation will evince that these useful institutions were not laid in vain; . . . our maxim is rather to make good men than great scholars: let us hope for the union, for that makes the man, and the useful citizen.

I. Allen, *The Natural and Political History of the State of Vermont, in* 1 Collections of the Vermont Historical Society 319, 482 (1870) (emphasis added). In thus characterizing education as the "cement of [the] State," Allen was expressing "a central tenet of republicanism: no democracy can survive without a virtuous citizenry . . . 'and to inspire it ought to be the principal business of education.'" J. Nelson, *Adequacy in Education: An Analysis of the Constitutional Standard in Vermont*, 18 Vt. L. Rev. 7, 35-37 (1993) (quoting C. Montesquieu, *The Spirit of the Law*, bk. IV, ch. 5, ¶ 5, *quoted in* A. Hubsch, *Education and Self-Government: The Right to Education Under State Constitutional Law*, 18 J.L. & Educ. 93, 95 n.1 (1989)). Because human nature was not viewed by the framers as naturally inclined to virtue, Allen and his contemporaries "saw education as the state's tool to insure self-preservation." *Id.* at 37. As Moses Mather concisely observed in 1775: "'The strength and spring of every free government . . . is the virtue of the people; virtue grows on knowledge, and knowledge on education.'" Wood, *supra,* at 120 (quoting M. Mather, *America's Appeal to the Impartial World* 66-67 (1775)). Thus understood, the Education Clause assumes paramount significance in the constitutional frame of government established by the framers: it expressed and incorporated "that part of republican theory which holds education essential to self-government and which recognizes government as the source of the perpetuation of the attributes of citizenship." Hubsch, *supra,* at 97-98 (footnote omitted).

The State places great store in the fact that the 1786 amendment which combined the virtue and education sections also modified the text of the Education Clause from its original "schools

*shall* be established" to its current "*ought* to be maintained." Vt. Const. of 1777, ch. II, § 40; Vt. Const. of 1786, ch. II, § 38. From this it infers that the framers intended to relegate education to a mere discretionary ideal. The framers, however, drew no distinction between "ought" and "shall" in defining rights and duties. The Declaration of Rights set forth in the revised Constitution of 1786 declared, for example, "[t]hat all elections *ought* to be free and without corruption," Vt. Const. of 1786, ch. I, art. 9 (emphasis added), that search warrants unsupported by probable cause "*ought* not to be granted," *id.* ch. I, art. 12 (emphasis added), that the right to trial by jury "*ought* to be held sacred," *id.* ch. I, art. 14 (emphasis added), and that freedom of the press "*ought* not to be restrained," *id.* ch. I, art. 15 (emphasis added). The contention that the framers intended these fundamental freedoms to be mere aspirational ideals rather than binding and enforceable obligations upon the state cannot be seriously maintained.

■ The State also suggests that placement of the Education Clause in Chapter II, setting forth the "Frame of Government," rather than Chapter I, which contained the Declaration of Rights, implies that education was not considered by the framers to be an individual right. The argument is equally unpersuasive. Chapter II of the original Constitution enumerated any number of individual rights besides education, including the right to trial by jury, Vt. Const. of 1777, ch. II, § 22, the right to bail, *id.* ch. II, § 25, and the right to hold and acquire land. *Id.* ch. II, § 38. From the perspective of the framers, Chapter II represented a perfectly logical place to provide for education. We have already touched upon the essential role of education in the framers' theory of self-government. Considered in this light, the Education Clause properly belonged in that part of the Constitution setting forth the frame of government, and the essential conditions of its survival.

Apart from its prominence in the Constitution, the importance of education to self-government and the state's duty to ensure its proper dissemination have been enduring themes in the political history of Vermont. From the beginning of the Republic, Vermont's chief executives have used the occasion of their inaugural addresses to elaborate upon the state's affirmative obligation to cultivate the essential attributes of citizenship through public education. Addressing the General Assembly in 1802, Governor Isaac Tichenor observed: "It is on the progress and influence of education, knowledge, virtue and religion, that all orders of men will receive the most substantial

benefits that can accrue, either to individuals or to societies." 1802 Journal of the General Assembly of the State of Vermont, 19. Governor Samuel Crafts, speaking in 1828, echoed these sentiments: "As our social and political institutions can be sustained and perpetuated, only by the general virtue and intelligence of the community; it is our indispensable duty . . . to make such provision for instruction, as will qualify our youth to discharge the important trust which will be committed to their care." 1828 Journal of the General Assembly of the State of Vermont, 12. Similarly, Governor Erastus Fairbanks, on the eve of the Civil War, declared: "[A] proper system of instruction is recognized as one of the first duties of the State. . . . [I]t is only as the youth of the country shall be properly instructed, morally and intellectually, for the duties of citizens, that our free institutions, in the hands of the coming and future generations, are to be preserved intact." 1860 Journal of the Senate of the State of Vermont, 18.

The courts of this state have been no less forthright in declaring education to be a fundamental obligation of the state. In 1860, this Court gave voice to that duty with unequivocal clarity:

> From the earliest period in this State, the proper education of all the children of its inhabitants has been regarded as a matter of vital interest to the State, a duty which devolved upon its government . . . .
>
> The constitution of the State especially enjoins upon the legislature the duty of passing laws to carry out this object . . . .
>
> . . . .
>
> . . . [T]he whole subject of the maintenance and support of common schools has ever been regarded in this State as one not only of public usefulness, but of public necessity, and one which the State in it sovereign character was bound to sustain.

*Williams v. School Dist. No. 6*, 33 Vt. 271, 274-75 (1860). Similar statements in later decisions abound. See, e.g., *Buttolph v. Osborn*, 119 Vt. 116, 119, 119 A.2d 686, 688 (1956) ("It [is] clear that education is a function of the state as distinguished from local government."); *Vermont Educ. Bldgs. Fin. Agency v. Mann*, 127 Vt. 262, 266, 247 A.2d 68, 71 (1968) ("[O]ur Constitution imposes on the General Assembly a duty in regard to education that is universally accepted as a proper public purpose."), *appeal dismissed*, 396 U.S. 801 (1969); *Palmer v. Bennington Sch. Dist.*, 159 Vt. 31, 37, 615 A.2d 498, 502 (1992) (discussing importance of education in preserving representa-

tive government and noting "state's commitment to this essential government function").

Notwithstanding its long and settled history as a fundamental obligation of state government, the State contends that the primary constitutional responsibility for education rests with the *towns* of Vermont, that its funding must be derived from whatever sources are available locally, that the only substantial tax available to towns is the property tax, and therefore that funding inequities are an inevitable — but nevertheless constitutional — consequence of local disparities in property wealth. The State asserts that its only responsibility, if any, is to ameliorate inequities if they become too extreme, and that it has acted responsibly in this role.

■ This argument fundamentally misunderstands the state's constitutional responsibility — outlined above — for public education. The state may delegate to local towns and cities the authority to finance and administer the schools within their borders; it cannot, however, abdicate the basic responsibility for education by passing it on to local governments, which are themselves creations of the state.

The State's position confuses constitutional ends — the obligation to maintain a "competent number of schools . . . in each town," Vt. Const. ch. II, § 68 — with legislative means, that is, the methods it has employed to fulfill its obligation. As noted, our Constitution *nowhere* states that the revenue for education must be raised locally, that the source of the revenue must be property taxes, or that such revenues must be distributed unequally in conformity with local wealth. To be sure, these are longstanding and traditional components of the educational financing system in Vermont, but none of these represents a constitutional imperative. They are choices made by the government of the State of Vermont, and choices for which it bears ultimate responsibility.

The wisdom of the original constitutional structure becomes most apparent when considered in a modern context. Chapter II, § 68 states in general terms the state's responsibility to provide for education, but is silent on the means to carry it out. What the State characterizes as the basic constitutional structure of the system is really the legislative means of implementing it, which can and should be modified if it no longer fulfills its purpose. Means and methods that were effective in a rural society with limited development of property resources and largely local industries may become ineffective with the advent of major ski resorts and sizable industrial developments. The towns where the employees of these businesses actually live and

educate their children bear the financial burden of development, while reaping none of the tax advantages.

Whether this dysfunction between means and ends ultimately denies the citizens of Vermont the "common benefit," Vt. Const. ch. I, art. 7, of the education constitutionally guaranteed is the question to which we now turn.

### B. The Right to Equal Educational Opportunities

█ It is against the foregoing legal and historical backdrop that the sharp disparities among school districts in per-pupil spending, and the resultant inequities in educational opportunities, must be constitutionally evaluated. We have held that the Common Benefits Clause in the Vermont Constitution, see ch. I, art. 7, is generally coextensive with the equivalent guarantee in the United States Constitution, and imports similar methods of analysis. *Lorrain v. Ryan*, 160 Vt. 202, 212, 628 A.2d 543, 550 (1993); *State v. George*, 157 Vt. 580, 588, 602 A.2d 953, 957 (1991). As a general rule, challenges under the Equal Protection Clause are reviewed by the rational basis test, whereby "distinctions will be found unconstitutional only if similar persons are treated differently on 'wholly arbitrary and capricious grounds.'" *Smith v. Town of St. Johnsbury*, 150 Vt. 351, 357, 554 A.2d 233, 238 (1988) (quoting *Colchester Fire Dist. No. 2 v. Sharrow*, 145 Vt. 195, 199, 485 A.2d 134, 136 (1984)). Where a statutory scheme affects fundamental constitutional rights or involves suspect classifications, both federal and state decisions have recognized that proper equal protection analysis necessitates a more searching scrutiny; the State must demonstrate that any discrimination occasioned by the law serves a compelling governmental interest, and is narrowly tailored to serve that objective. *Rodriguez*, 411 U.S. at 16-17; *Veilleux*, 131 Vt. at 40, 300 A.2d at 625.

This is not a case, however, that turns on the particular constitutional test to be employed. Labels aside, we are simply unable to fathom a legitimate governmental purpose to justify the gross inequities in educational opportunities evident from the record. The distribution of a resource as precious as educational opportunity may not have as its determining force the mere *fortuity* of a child's residence. It requires no particular constitutional expertise to recognize the capriciousness of such a system.

█ The principal rationale offered by the State in support of the current financing system is the laudable goal of local control. Individual school districts may well be in the best position to decide whom

to hire, how to structure their educational offerings, and how to resolve other issues of a local nature. The State has not explained, however, why the current funding system is necessary to foster local control. Regardless of how the state finances public education, it may still leave the basic decision-making power with the local districts. Moreover, insofar as "local control" means the ability to decide that more money should be devoted to the education of children within a district, we have seen — as another court once wrote — that for poorer districts "such fiscal freewill is a cruel illusion." *Serrano v. Priest*, 487 P.2d 1241, 1260 (Cal. 1971). We do not believe that the voters of Londonderry necessarily care more about education than their counterparts in Lowell simply because they spend nearly twice as much per student ($6005 as compared to $3207 in fiscal year 1995). On the contrary, if commitment to learning is measured by the rate at which residents are willing to *tax* themselves, then Lowell, with a property base of less than one-third per student than that of Londonderry, and a property tax nearly *twice* as high, should be considered the more devoted to education.

In short, poorer districts cannot realistically choose to spend more for educational excellence than their property wealth will allow, no matter how much sacrifice their voters are willing to make. The current system plainly does not enhance fiscal choice for poorer school districts.

The State also appears to argue that the current system must be upheld because, even conceding the Constitution provides a basic right to education, there is no evidence the framers intended that the right be distributed equally. The answer to this argument is twofold. First, although the documentary evidence of the framers' particular intentions in this regard is negligible, as early as 1828 the scope of the state's duty to educate was defined in terms of fundamental equality.

> Our youth can be considered in no other light, than as children of the state, having a common interest in the preservation of, and in the benefits to be derived from, our free institutions — and possessing also, whether rich or poor, equal claims upon our patriotism, our liberty and our justice. *It is, therefore, our paramount duty to place the means for obtaining instruction and information, equally within the reach of all.*

Inaugural Address of Governor Samuel Crafts, 1828 Journal of the General Assembly of the State of Vermont, 12 (emphasis added). Thus, while the political means, or the political will, to effectuate the

goal of educational equality may have been absent for many years, the *principle* has long been present.

The second response to the State's argument is simply that equal protection of the laws cannot be limited by eighteenth-century standards. While history must inform our constitutional analysis, it cannot bind it. Yesterday's bare essentials are no longer sufficient to prepare a student to live in today's global marketplace. To keep a democracy competitive and thriving, students must be afforded equal access to all that our educational system has to offer. In the funding of what our Constitution places at the core of a successful democracy, the children of Vermont are entitled to a reasonably equal share.

The State additionally asserts that the current educational state-aid program, the Foundation Plan, serves the rational purpose of ameliorating disparities among school districts while preserving a maximum level of local control over spending. We do not question the laudatory objectives of the Foundation Plan. As noted earlier, however, the notion that property-tax-based funding allows local school districts the flexibility to devote more money to education is, for many districts, largely illusory. Moreover, there is no necessary or logical connection between local control over the raising of educational funds, and local decisionmaking with respect to educational policy.

Nor are we persuaded that the Foundation Plan sufficiently improves the financial position of property-poor districts as compared to property-rich districts to eliminate any constitutional claim of discrimination. The Constitution does not, to be sure, require exact equality of funding among school districts or prohibit minor disparities attributable to unavoidable local differences. As we have seen, however, that is not the situation we confront. On the contrary, the evidence discloses substantial interdistrict funding disparities, despite the efforts of the state through the comprehensive state-aid program.

Finally, the State contends that the Common Benefits Clause is simply not offended by the unequal treatment of public schoolchildren residing in different districts so long as all are provided a minimally "adequate" education. The basis for such an argument is not entirely clear. We find no authority for the proposition that discrimination in the distribution of a constitutionally mandated right such as education may be excused merely because a "minimal" level of opportunity is provided to all. As Justice Marshall observed, "The Equal Protection Clause is not addressed to . . . minimal sufficiency but rather to the

unjustifiable inequalities of state action." *Rodriguez*, 411 U.S. at 89 (Marshall, J., dissenting).

The evidence demonstrates, in sum, that the system falls well short of achieving reasonable educational equality of opportunity. Therefore, we hold that the student and school district plaintiffs are entitled to judgment as a matter of law that the current educational financing system in Vermont violates the right to equal educational opportunities under Chapter II, § 68 and Chapter I, Article 7 of the Vermont Constitution.

In so holding we emphasize that *absolute* equality of funding is neither a necessary nor a practical requirement to satisfy the constitutional command of equal educational opportunity. As plaintiffs readily concede, differences among school districts in terms of size, special educational needs, transportation costs, and other factors will invariably create unavoidable differences in per-pupil expenditures. Equal opportunity does not necessarily require precisely equal per-capita expenditures, nor does it necessarily prohibit cities and towns from spending more on education if they choose, but it does not allow a system in which educational opportunity is necessarily a function of district wealth. Equal educational opportunity cannot be achieved when property-rich school districts may tax low and property-poor districts must tax high to achieve even minimum standards. Children who live in property-poor districts and children who live in property-rich districts should be afforded a substantially equal opportunity to have access to similar educational revenues. Thus, as other state courts have done, we hold only that to fulfill its constitutional obligation the state must ensure *substantial* equality of educational opportunity throughout Vermont. See *Rose v. Council for Better Educ.*, 790 S.W.2d 186, 211 (Ky. 1989) (state constitution requires that educational opportunities be "substantially uniform throughout the state"); *McWherter*, 851 S.W.2d at 156 (state education financing system must provide "substantially equal educational opportunities"); *Edgewood*, 777 S.W.2d at 397 (state constitution requires "substantially equal access to similar revenues per pupil").

Finally, we underscore the limited reach of our holding. Although the Legislature should act under the Vermont Constitution to make educational opportunity available on substantially equal terms, the specific means of discharging this broadly defined duty is properly left to its discretion.

## C. Remaining Claim

 In addition to educational equity, the property-owner and school-district plaintiffs have claimed a right to tax-rate equity; they assert that taxpayers from property-poor districts are compelled to pay higher tax rates, and therefore contribute disproportionate sums to fund education, in violation of Chapter I, Article 9 of the Vermont Constitution. Without explanation, the trial court denied summary judgment on this point, thereby allowing the claim to proceed to trial. Although the State appealed the ruling, it devoted such scant attention to the subject in its briefs (two pages out of sixty) that we would be forced "to undertake a search for error where it [was] not adequately briefed or supported by the arguments." *Rowe v. Brown*, 157 Vt. 373, 379 n.7, 599 A.2d 333, 337 n.7 (1991). Accordingly, we decline to rule on this issue at this time.

*Declaratory judgment entered for the student and school-district plaintiffs on their claim that the current educational funding system denies equal educational opportunities in violation of the Vermont Constitution; remanded so that jurisdiction may be retained until valid legislation is enacted and in effect, and for any further proceedings on plaintiffs' remaining claim, if necessary.*