STATE OF VERMONT

SUPERIOR COURT
Washington Unit

CIVIL DIVISION
Docket No. 51-2-19 Wncv

2020 NOV -6 A 8: 02

Human Rights Defense Center,
    Plaintiff

v.

FILED

DECISION ON MOTION

Correct Care Solutions, LLC,
Correctional Care Solutions,
    Defendants

## Cross-Motions for Summary Judgment

Plaintiff Human Rights Defense Center (HRDC) requested that a private entity, Correct Care Solutions LLC (now Wellpath LLC), produce certain records in its possession related to its provision of healthcare services to Vermont inmates from 2010 to 2015 under contract with the State pursuant to Vermont's Access to Public Records Act (PRA), 1 V.S.A. §§ 315–320. HRDC declined to produce any records, claiming that, as a private entity rather than a public agency, it is not subject to the Act. HRDC has taken the position that Wellpath is subject to the Act as the "functional equivalent" of a public agency, subjecting it to the PRA, and eventually filed this action to compel production. Wellpath argues that it is not a public agency, the plain language of the PRA forecloses the concept of functional equivalence and, in any event, no reasonable application of the test for functional equivalence, or similar analyses, would subject it to the PRA. The parties have filed cross-motions for summary judgment addressing these issues.

The facts are undisputed. The contract(s) between Wellpath and the Vermont Department of Corrections began in 2010; payment to Wellpath was on a "cost plus" basis. Wellpath was to operate the healthcare program for Vermont inmates in compliance with the law and the standards of the National Commission on Correctional Heath Care. The DOC retained final decision-making authority over clinical disputes about inmate care.

The contract put in place a series of financial penalties in the event that certain performance or quality measures were not met. As part of its reporting requirement, Wellpath was required to notify the State within 10 days of receiving any notice of claims for damages related to its performance of the contract. The contract specified that Wellpath remained an independent contractor and required Wellpath to defend and indemnify the State against claims.

On December 23, 2015, HRDC sent a request to Wellpath seeking records of pre-complaint demands for relief against it from potential claimants or their attorneys in connection with any medical services provided by Wellpath and all records related to any payments made by Wellpath (or any entity on its behalf) to claimants. Wellpath responded by letter of January 8, 2016 stating that it was not subject to the PRA. Two years later, HRDC sent

similar requests to Wellpath and sought copies of contracts with the State as well. Wellpath did not respond, and HRDC eventually filed this action.

The PRA applies to public agencies and public records. HRDC's core contention in this case is that Wellpath, in relation to the work it performed for the State, is the functional equivalent of a public agency and thus is subject to the PRA. The court recently summarized functional equivalence as follows:

> A Vermont trial court decision, *Prison Legal News v. Corr. Corp. of Am.*, No. 332-5-13 Wncv, 2014 WL 2565746 (Vt. Super. Ct. Jan. 10, 2014), first adopted and applied the concept of functional equivalence under the PRA in Vermont. The concept of functional equivalence clarifies that the definition of a "public agency" subject to the PRA, 1 V.S.A. § 317(a)(2), in limited circumstances, reaches those private entities that are, in effect, the functional equivalent of the traditional governmental entities that ordinarily would be subject to the PRA. It recognizes the foundational importance of transparency to the form and function of government and reinforces the PRA by preventing those who govern from obviating it by mere dint and discretion to delegate public functions to nongovernmental entities.
>
> *Prison Legal* was adopted by and applied in detail in *Whitaker v. Vt. Info. Tech. Leaders, Inc.*, No. 781-12-15 Wncv, 2016 WL 10860908 (Vt. Super. Ct. Oct. 27, 2016). Functional equivalence also has arisen in *Human Rights Defense Center v. Correct Care Solutions*, No. 51-2-19 Wncv (Vt. Super. Ct. Oct. 18, 2019), *Sleigh v. Barrett*, No. 158-7-18 Oscv (Vt. Super. Ct. Mar. 28, 2019); and *Long v. City of Burlington*, No. 996-11-16 Cncv (Vt. Super. Ct. Oct. 10, 2017). The Vermont Supreme Court has not yet had the opportunity to address this matter.

*McVeigh v. Vt. Sch. Bds. Assoc.*, No. 484-9-19 Wncv (Vt. Super. Ct. Sept. 21, 2020) (Bent, J.) (The undersigned also was the author of *Prison Legal*.). In *McVeigh*, the court ruled that the Vermont School Boards Association is not the functional equivalent of a public agency and thus the PRA did not apply to it. That decision very recently was appealed.

The test for functional equivalence described in *Prison Legal* uses a nonexclusive list of factors as follows:

> The predominant factors used to evaluate functional equivalence are: "(1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by the government." "The cornerstone of this analysis, of course, is whether and to what extent the entity performs a governmental or public function, for we intend by our holding to ensure that a governmental agency cannot, intentionally or unintentionally, avoid its disclosure obligations under the Act by contractually delegating its responsibilities to a private entity."

2

*Whitaker v. Vt. Info. Tech. Leaders, Inc.*, No. 781-12-15 Wncv, 2016 WL 10860908, *2 (Vt. Super. Ct. Oct. 27, 2016) (citations omitted).

In this case, HRDC relies heavily on the *Prison Legal* and *Whitaker* decisions, which the court recently summarized as follows:

> In *Prison Legal*, the court ruled that the Vermont Department of Corrections' delegation of the uniquely governmental responsibility of imprisoning Vermonters to a private company, Corrections Corporation of America (CCA), made CCA the functional equivalent of a public agency for PRA purposes. In *Whitaker*, the court ruled that a nonprofit entity, Vermont Information Technology Leaders (VITL), had become so woven into the fabric of the State's regulation and operation of the health care industry that it too had become the functional equivalent of a public agency for PRA purposes. The *Whitaker* court recognized that healthcare, unlike imprisonment, is not an exclusively governmental function, but VITL's extraordinary entanglement with government left little doubt that it was doing much other than conducting public agency business by delegation.

*McVeigh v. Vt. Sch. Bds. Assoc.*, No. 484-9-19 Wncv, Decision at 2–3 (Vt. Super. Ct. Sept. 21, 2020).

HRDC's argument here is that the provision of medical care to incarcerated people is a constitutionally and statutorily required function of government for which the State paid millions to Wellpath. See *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (describing government's constitutional "obligation to provide medical care for those whom it is punishing by incarceration"); 28 V.S.A. § 801(a) ("The Department shall provide health care for inmates in accordance with the prevailing medical standards."). Wellpath, it argues, therefore should be treated as the functional equivalent of a public agency for PRA purposes.

Wellpath's motion takes aim at the *Prison Legal News* and *Whitaker* decisions, asserting that they were wrongly decided and should not be followed here. It argues that this case is properly decided by simply applying the straightforward and plain meaning of the expression, "public agency," which clearly excludes it, as a private entity, from the purview of the PRA. It argues that the *Prison Legal* and *Whitaker* courts colored outside the lines by ignoring the plain language of the PRA. See *Doyle v. City of Burlington Police Dep't*, 2019 VT 66, ¶ 6; *State v. Jacobs*, 144 Vt 70, 75 (1984). It also argues, however, that even if functional equivalence is applied here, it never acted in the sort of functionally equivalent manner that could subject it to the PRA.

Wellpath argues that the PRA defines "public agency" to include clearly governmental entities only and does not include "private contractor" among the examples provided. It further argues that Vermont statutes governing privatization contracts, 3 V.S.A. §§ 341–349, nowhere imply that such contracts subject the contractor to the PRA. These statutes, however, do not address the issue of public records one way or another and thus offer nothing to support the inference that Wellpath draws, that the omission means something.

3

Otherwise, Wellpath's appeal to literalism is well-taken but misplaced in this case. As the Vermont Supreme Court has frequently said, the first step of statutory interpretation is an examination of "the statute's language because we presume that the Legislature intended the plain, ordinary meaning of the statutory language." *Shires Hous., Inc. v. Brown*, 2017 VT 60, ¶ 9, 205 Vt. 186. As one treatise explains, however, this principle can fit awkwardly with the prevalent recognition that language lacks intrinsic meaning. "A judge claiming not to be construing a statute cannot avoid what he has learned about customary language usage and common understanding associated with the relevant text." 2A Sutherland Statutory Construction § 46:2 (7th ed.). Courts thus apply, or ought to apply, the plain meaning rule with some circumspection and attention to its limitations:

> Despite the jurisprudential tradition to commence most statutory interpretations with a recitation of the plain meaning rule, courts have carved out limitations to the rule as well. These limitations, too, have been given expression in a variety of ways, and illustrate the possibly complex manner in which this rule may interact with and yield to other rules of interpretation, and may also reflect the judicial disinclination towards an absolutist analytic process. A court may look beyond the plain language of a statute when: applying the language according to its plain meaning would lead to an absurd result, or there is "obvious" or "clear" evidence of contrary legislative intent; it finds "a specific indication to the contrary;" it finds "compelling reasons to hold otherwise;" some other section of an act expands or restricts its meaning, or a particular provision is repugnant to an act's general purview, or other acts *in pari materia*, or the relevant legislative history, imports a different meaning; an act's plain meaning departs from its policy, and it finds a clearly expressed legislative intention contrary to the statute's language; it finds "some other compelling reason" to disregard an act's or provision's plain meaning.

2A Sutherland Statutory Construction § 46:1 (7th ed.) (footnotes omitted). Vermont case law includes myriad such examples and generally does not reflect an "absolutist analytic process," and for good reason. While plain meaning is the necessary starting place for statutory interpretation, ultimately, "[s]tatutes should be read sensibly" too. 2A Sutherland Statutory Construction § 46:2 (7th ed.).

The legislature plainly intended to define "public agency" expansively to ensure that all public records of the State would fall within the reach of the PRA: "'[p]ublic agency' or 'agency' means *any* agency, board, department, commission, committee, branch, instrumentality, or authority of the State or any agency, board, committee, department, branch, instrumentality, commission, or authority of any political subdivision of the State." 1 V.S.A. § 317(a)(2). In particular, the terms "instrumentality" and "authority" encompass circumstances in which the State has given over its power to some other entity. An instrumentality is a "means . . . through which a function of another entity is accomplished." Black's Law Dictionary 802 (7th ed. 1999). "Authority" may refer to "a corporation that administers a public enterprise." *Id.* at 128. Certainly the definition does not say, "but not private contractors," yet this is the unnecessary limit on its breadth that Wellpath constructs behind the veil of "plain meaning."

4

The court evaluated the expression "public agency" in detail in the *Prison Legal* decision by examining the literal language of the statute, the context of related provisions, clear indications of legislative intent, and historical circumstances, and the court adopts that analysis for purposes of this case. The court also notes that the PRA is no ordinary statutory enactment. It expounds on a fundamental issue of governmental accountability "embodied in the Vermont Constitution: the principle that in a constitutional democracy, officials of government should be accountable to the people." P. Teachout, "Trustees and Servants": Government Accountability in Early Vermont, 31 Vt. L. Rev. 857, 859 (2007); see also Vt. Const. ch. I, art. 6 ("That all power being originally inherent in and co[n]sequently derived from the people, therefore, all officers of government, whether legislative or executive, are their trustees and servants; and at all times, in a legal way, accountable to them."). While Article 6 does not have the "specificity necessary to create legal entitlements with definite character," it obviously informs the legislature's undertaking in enacting and crafting the PRA.

Wellpath's plain meaning interpretation of "public agency" does little more than announce the result of its analysis. The court rejects Wellpath's conclusion and adopts the analysis and functional equivalency test as set forth in *Prison Legal*. The question thus turns to whether Wellpath, in providing healthcare services for Vermont inmates, was in some way exercising governmental power or involved in governmental decision-making sufficiently to reveal it as the functional equivalent of a public agency. The summary judgment record is clear that it was not.

Again, the test looks to "(1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by the government." Wellpath was not created by the State and its funding by the State is not a helpful factor in this case as it was provided directly for services rendered according to the terms of a contract negotiated at arm's length. Governmental involvement also is not helpful. The only substantial "involvement" of the State in Wellpath's affairs relates to the performance of the contract.

The most important factor, governmental function, also clearly demonstrates that Wellpath was not, in the performance of its contract with the State, the functional equivalent of a public agency. The court noted in *Whitaker* that "[w]hile healthcare is not an *exclusive* governmental function, governmental assumption of responsibility and involvement in healthcare and healthcare funding has grown in recent years at both the federal and state level." *Whitaker v. Vt. Info. Tech. Leaders, Inc.*, No. 781-12-15 Wncv, 2016 WL 10860908 (Vt. Super. Ct. Oct. 27, 2016). However, this is particularly so in terms of regulation of the industry and policymaking around funding related to the provision of services. Some hospitals have been run by governments. But to say that a government provides healthcare, or has a constitutional or statutory duty to do so, does not mean that ordinary government workers ever typically thus had to become doctors and nurses in order for those services to be delivered. Of course, the actual healthcare is provided by healthcare professionals.

That is all Wellpath was in this case. It actually delivered the healthcare services that the State provided to inmates according to the terms of its contract with the State. Wellpath exercised no clear governmental decision-making power or policymaking function, it was not woven into the State's regulation of the healthcare industry or prison operations, and it did not

5

substantially do anything else that required a delegation of governmental power. It did not do what government does. It was simply a third-party contractor.

Ultimately, HRDC makes the same mistake here that the requestor made in *McVeigh* when he attempted to leverage the mere overlap of the Vermont School Boards Association's interest in the field of education with the State's "obligation to provide for the education of its youth." *Brigham v. State*, 166 Vt. 246, 258 (1997). The test requires far more. "The mere overlap of interest or subject matter is immaterial for purposes of functional equivalence. The test looks for a direct or indirect delegation of public function accompanied by sufficient entanglements showing that the private entity in fact is functioning as a public agency." *McVeigh v. Vt. Sch. Bds. Assoc.*, No. 484-9-19 Wncv, Decision at 3 (Vt. Super. Ct. Sept. 21, 2020). HRDC has not made that showing here.

The importance of the information being sought to the journalist/Plaintiff and public at large is well recognized by the court but is not a factor for the court's consideration in this particular dispute.

Order

For the foregoing reasons, Wellpath's motion for summary judgment is granted. HRDC's motion for summary judgment is denied. Defendant to submit a final judgment order.



Robert R. Bent,
Judge

6