# Thomas Buttolph Et Als v. Raymond Osborn Et Als

[119 A2d 686]

October Term, 1955.

Present: **Jeffords, C. J., Cleary, Adams, Chase and Hulburd, JJ.**

Opinion Filed January 3, 1956.

*Franklin S. Billings, Jr.* for the petitioners.

*Lawrence & O'Brien* for the petitionees.

**Hulburd, J.** This is a petition brought by fourteen residents and taxpayers of the town of Shoreham, Vermont,

for a writ of mandamus to compel the petitionees, the school directors of that town, to open and maintain the high school there as in the past, and to contract with teachers to staff the high school for the ensuing year.  The case was heard on the petitionees' demurrer.

The petition alleges that the school directors closed the Shoreham high school at the end of the 1954-1955 school year and are arranging for the advanced education of the resident pupils outside the town.  It further alleges that on April 18, 1955 the voters of the town of Shoreham by a vote of 178 to 132 instructed the board of school directors to continue to maintain a high school in Shoreham and to hire teachers for that purpose.  It further alleges that a majority of the parents and guardians in Shoreham, having children attending high school, have indicated to the board of school directors that they wish to have their children educated in a high school in Shoreham and not in a high school or academy outside of Shoreham.  The petition then alleges that notwithstanding the expressed vote and wishes of the voters and residents of Shoreham, the school directors have refused to comply therewith and are wrongfully taking no steps to continue to maintain a high school in Shoreham and that this refusal is arbitrary, capricious, and based on personal prejudice and selfish motives and that it is not in accordance with their duty under the constitution of the State of Vermont.

To the allegations of this petition, the petitionees have demurred.  At the outset the petitionees interpose a technical objection.  They say that although the petitioners have alleged that the action of the school directors was arbitrary and capricious, the petitioners have failed to set forth any facts which the court might find constituted this capriciousness and arbitrary selfish conduct, - unless, of course, acting contrary to the vote of the town and the desires of its inhabitants is a sufficient allegation.

The petitioners, while recognizing the requirements of pleading generally, claim that where the official character of the petitionees is set forth and what is sought is the performance of a public duty under the law, that it is a sufficient complaint to allege the failure to so perform and that there is no need

to set out the failure with any particularity. The petitioners cite *Clement* v. *Graham*, 78 Vt 290, 306, 63 A 146. This at once brings us to the question: Is there any statute, or statutes, imposing a duty as claimed by the petitioners? It immediately becomes apparent that the decision of the preliminary question involves a determination of the central point of the controversy. The technical question and the main question on the merits merge if the petitioners' contention is adopted.

In such a situation the method of procedure in *City of Montpelier* v. *Gates*, 106 Vt 116, 170 A 473, becomes virtually incapable of being disregarded. It was there said at page 120: "In view of the importance of the case to the State and its officers, and the facts being conceded, the demurrer will be construed as a motion (citing *Clement* v. *Graham*, 78 Vt 290, 306, 63 A 146, Ann Cas 1913E, 1208) and the merits of the controversy disposed of without regard to the technical sufficiency of the pleadings." We adopt that procedure in this case.

As we have pointed out the gist of the petitioners' claim is that the closing of the high school in Shoreham by the school directors in the face of a vote to the contrary by the citizens of Shoreham was in violation of the school directors' legal duty and beyond their statutory and constitutional powers.

In many ways this claim does not present a new problem in the educational history of Vermont. It has been before this Court in various aspects over a long period of time. Thus in 1845 it was held in *Mason* v. *School Dist. of Brookfield*, 20 Vt 487, that the dissatisfaction of a majority of the district is of no effect upon the power of the prudential committee in employing and dismissing a teacher. So too, in *School District No. 13 in Waterbury* v. *Harvey*, 56 Vt 556, it was held that the vote of a school district instructing the prudential committee to hire a female teacher was not obligatory on the committee but was advisory merely. In the same year this Court had occasion to consider the case of *Chittenden* v. *School District No. 1 in Waterbury*, 56 Vt 551, in which the district passed a vote as follows: "Voted that the prudential committee be instructed to employ no teacher for a term to extend beyond

this school year." In spite of this vote, a teacher was employed for a period which extended beyond the school year which constituted the official term of the committee. This is the case which contains a rather memorable sentence. Having first stated, at page 554, that "The several statutes constituting our common school system are to be read together, and liberally construed to effectuate the general public good proposed in their enactment," the Court went on to say: "A review of them will show that the legislature, having full power over the subject, has not entrusted the destiny of the system to the uncertain disposal of the 'fierce democracie' of the districts themselves, but has clothed officials with ample authority to keep the schools in motion in any event." If there was any doubt up to this point, the opinion made it clear that school directors are public officials who derive their power from the law.

This holding was to be followed by *Cobb* v. *School District No. 1 in Pomfret*, 63 Vt 647, 650, 21 A 957, 958, wherein it was said: "He (here a prudential committee of one) does not take his power from the district but from the statute." A reading of the statutes from early times, with the added changes as they were made from session to session of the Legislature, shows that school officials' hands were constantly being strengthened. They were clothed with more and more and not less and less power. It was made clear that education is a function of the state as distinguished from local government.

As time went on, the old district as an educational unit began to fade. With its disappearance there were bound to arise certain new problems. One of these was the transportation difficulty. Here again the Legislature enacted law conferring on the school directors additional power. It was they who were to decide in what circumstances transportation should be furnished the pupils of the town. It wasn't long before this new authority was challenged. In *Proctor* v. *Hufnail*, 111 Vt 365, 16 A2d 518, a petition was brought to this Court seeking to compel the school directors to furnish transportation for a certain child. The petition was dismissed, the Court saying at page 369, "An officer who is entrusted

with a duty which requires the exercise of his judgment and discretion is entitled to proceed therein without judicial interference and may render a decision that will be final and conclusive."

The petitioners admit that school directors have vast powers relative to the internal management of the affairs of a school, but they say that in the matter of maintaining schools these powers are curtailed by V. S. 47, §4217, wherein it is stated that "subject to the provision of this title (Title 18) the board shall determine the number and location of schools and may re-locate or consolidate the schools as convenience and efficiency may require; but in the exercise of such power, strict observance of the constitutional requirements as to competency in number and location shall be observed." The petitioners point to a provision in V. S. 47, §4339, as amended by No. 239 of the Acts of 1955 as being one which curtails, under Title 18, the powers of school directors on the matter of maintaining high schools. That provision reads: "4339. *Payment of Tuition*. Each town district shall maintain a high school or furnish higher instruction, as hereinafter provided for its advanced pupils at a high school or academy to be selected by the parents or guardian of the pupil, within or without the state * * *." The petitioners claim that the foregoing means that the school board is compelled to maintain a high school within a town or furnish higher education outside the town according as to how the parents or guardians decide.

■■ Such an interpretation is a gross distortion of the plain intention of the Legislature. Clearly there is nothing in section 4339 curtailing the school board's powers as claimed. Just the opposite; the school board has the option of doing one of two things: to maintain a high school within the town, or furnish higher education elsewhere. The parents and guardians have a choice, but that choice is not whether or not a town shall maintain a high school, but rather where the pupils shall go in event the school directors decide against attempting to have a high school. We think this is the real meaning and purpose of the Legislature. It gives effect to the legislative intent, which is the fundamental rule in con-

struing statutes. *Loeb* v. *Loeb*, 118 Vt 472, 483, 114 A2d 518; *State* v. *Estate of Taranovich*, 116 Vt 1, 5, 68 A2d 796. The school directors of Shoreham were merely putting into effect the plain meaning of the language of the enactment. Had the Legislature intended what the petitioners claim, the statute would not read as it does. Compare *Camp* v. *Superman*, 119 Vt 62, 118 A2d 353.

In reviewing our educational history and surveying our present position, it is apparent that "the 'fierce democracie' of the districts" has now become the fierce democracy of the towns. Both are inspired by the same fear: that of outside control. Already, at the mention of federal aid, the fierce democracy of the states is beginning to emerge. The reaction is ever the same; only the point of view changes. That which was treated as a sort of provincialism in the districts will be trying to justify itself as something else on the state level.

In the light of historical development, it is not in Vermont alone that each succeeding legislature has placed more and more authority in the hands of public officials relating to our schools. Vermont has merely manifested a trend to be found in many states. Such a trend has encountered exactly the same sort of opposition elsewhere that it has here. For example, in *Morse* v. *Ashley*, 193 Mass 294, 79 NE 481, 482, a petition for a writ of mandamus was brought to compel the school committee of a Massachusetts town to re-open a school which they had closed. The town had voted to re-open it, but the committee refused to comply with the vote. The writ was denied. It was pointed out that there, as here, the school committee had, by statute, the general charge and superintendence of all public schools and that in the performance of this duty the committee acted as public officers and not as agents of the town. The court then said: "This duty rests upon the committee; and of course upon them rests also the responsibility for the proper discharge of it. While they may and should take into careful consideration any wish of the inhabitants of the town, whether expressed in a formal vote or otherwise, still in the end their own decision when reached is the decision of the Commonwealth, and is to control. To hold otherwise would be to put the superintendence of the

schools into the hands of two separate bodies, one the town and the other the school committee, each being likely to neutralize the good effect of the work of the other, and thus create confusion and inefficiency in the school system."

■ This Court has in mind that these are times in which educators have actively campaigned for public interest in our schools. The value of public support can hardly be over-estimated. It can arise only from good public relations. How far school directors can afford to ignore a vote of the people on any proposal is a matter which taxes their wisest discretion. No project itself is alone to be considered. It must be weighed in the light of the public will. It is not for this Court in any given case to review the circumstances and determine the course to be taken. To do so would be for this Court to substitute its judgment for the judgment of the board. This is not our function under the law and we have consistently refused to interfere in the absence of bad faith and arbitrary abuse of power. *Sanborn* v. *Weir*, 95 Vt 1, 5, 112 A 228. If experience should prove that school directors are not to be trusted with so broad a power and discretion, "it will be for the legislature rather than this Court to prescribe the proper limitation." *Cobb* v. *Pomfret*, *supra*, 63 Vt at page 650, 21 A 958.

There remains to say a word concerning the constitutional objection. The petitioners have invoked Articles 6 and 7 of our constitution. They read as follows:

"Article 6th. That all power being originally inherent in and consequently derived from the people, therefore, all officers of government, whether legislative or executive, are their trustees and servants; and at all times, in a legal way, accountable to them."

"Article 7th. That government is, or ought to be, instituted for the common benefit, protection and security of the people, nation, or community, and not for the particular emolument or advantage of any single man, family, or set of men, who are a part only of that community; and the community hath an indubitable, unalienable and indefeasible right, to reform or alter govern-

ment, in such manner as shall be, by that community, judged most conducive to the public weal."

■ If this were a case in which the high school of a town had been closed by an official other than a locally elected one, even though that official might be acting pursuant to some act which might hereafter be passed purporting to give him such authority, then we might be presented with a genuine constitutional question. But here we have no such situation. The Shoreham high school has been closed by officials locally elected by the Town of Shoreham. The authority to do this came from the law, but the decision to do it was by a locally elected board. The voters of Shoreham have not been deprived of all control over the situation. They may, in due course, replace their school directors at the end of their respective terms, with others who advocate maintaining a high school and thereby achieve the end they wish. The matter is still in their hands.

The idea that public officials should be responsive to public will is natural enough and not entirely an unwholesome one. One has only to consider that it has been the practice of many democracies, Britain for example, that when the official finds himself unsupported by popular vote, he desists and resigns. There is much to be said for such a system, but it is a concept which has never been adopted in American democracy. With us, the remedy comes at the next election.

*For the reasons stated, the petition is dismissed without costs.*