*Skiff v. South Burlington School Dist.*, No. 560-6-17 Cncv (Mello, J., Dec. 12, 2017).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| ROBERT A. SKIFF, et al.,<br>  Plaintiffs-Appellants<br><br> v.<br><br>SOUTH BURLINGTON SCHOOL<br>DISTRICT,<br>  Defendant-Appellee | Docket No. 560-6-17 Cncv |

RULING ON DEFENDANT'S MOTION TO DISMISS

This action stems from a recent decision by the South Burlington School District to change the name of its school sports teams. Plaintiffs, who are South Burlington voters, appeal to this court under V.R.C.P. 75, from the school board's refusal to put that issue on the ballot for a district-wide, non-binding, advisory vote. Plaintiffs seek a declaratory judgment and injunctive relief ordering such a vote. Now before the court is the School District's motion to dismiss.[1] Oral argument was heard on the motion on August 30, 2017. Post-hearing memoranda were then filed by the parties on October 20, 2017. Paul Gillies, Esq. represents Plaintiffs. Pietro Lynn and Sean Toohey, Esqs. represent the South Burlington School District.

Factual Background

For over 50 years the name of South Burlington's school sports teams was the "Rebels." After the South Burlington School Board voted to retire that name earlier this year, Plaintiffs, who are South Burlington voters, signed a petition requesting the School Board to place a non-binding, advisory article before the voters for a vote on whether to retain the name "Rebels" for the School District's sports teams. The ballot question as requested in the petition read: "Should the name of all South Burlington School District sports teams be the 'South Burlington Rebels' and should the South Burlington City

---

[1] On September 5, 2017, this court denied the Plaintiffs' motion to stay the School District from spending any further funds to replace the "Rebels" name on any facilities, uniforms, and equipment until this action is resolved. The court denied the motion on the grounds that Plaintiffs did not demonstrate that they would suffer irreparable injury in the absence of a stay.

Council and South Burlington School Board be required to make official, retain, and maintain this name for all South Burlington School District sports teams?"[2]

The petition was signed by more than five percent of the School District's voters. The School Board considered the petition and declined to add that question to the ballot for a public vote. Plaintiffs allege the School Board's failure to act violates Chapter I, Article 20 of the Vermont Constitution.

For purposes of a motion to dismiss, the court must accept the Plaintiffs' factual allegations as true and must assume that the Defendant's contravening assertions are false. <u>Alger v. Dep't of Labor and Industry</u>, 2006 VT 115, ¶ 12, 181 Vt. 309. Here, the factual record consists of allegations in pleadings and motions, affidavits and exhibits filed by the parties, and testimony taken at the hearing on Plaintiffs' motion to stay. The facts asserted by the Plaintiffs may be summarized as follows.

South Burlington came into existence in 1852, when the Vermont Legislature divided Burlington into two separate municipalities. Because South Burlington did not have its own schools, however, high-school-age children in South Burlington continued to attend Burlington's high school until the 1960s, when South Burlington opened its own high school.

At first, South Burlington High School's athletic teams had no official name and merely went by the name "Light Blues," in reference to one of the colors of their uniforms. Reporting on a football game against Burlington High School, the *Burlington Free Press* dubbed the new high school's team "rebels," because they were playing their former school. The name "Rebels" stuck, it was officially adopted, and it remained the official name of the South Burlington High School's athletic teams for over 50 years.

Although the origin of the name "Rebels" had not arisen out of issues relating to the Civil War, or support for the former Confederate States, or views on racial equality or inequality, individual South Burlington High School students sometimes waved the Confederate flag at high school football games. That practice was banned decades ago by school authorities, but some individuals continued to use the name "Rebels" as an excuse to express racist attitudes and beliefs at the school. Such individuals were always a small minority, however. For the great majority of South Burlington's residents and students, the name "Rebels" signified pride in their school and the values of hard work, independence and team spirit.

In the fall of 2015, the Board of the South Burlington School District included on its agenda an action item for "Rebel Name," in response to requests that the School Board consider dropping the name "Rebels" because of its association with attitudes of racial bigotry and intolerance. At the October 21, 2015, School Board meeting, all five board members supported retaining the "Rebels" name. One board member recounted that his children had attended South Burlington schools starting in the late 1970s and that he

_____

[2] A second petition requested a public vote on whether to prohibit the expenditure of funds to change the "Rebels" name. Plaintiffs concede that the complaint does not challenge any failure to act on the second petition.

associated South Burlington Rebels with critical thinkers who do not necessarily follow the mainstream crowd.[3] Another school board member, herself an alumna of South Burlington schools, stated that the schools had always taught students to "rebel" against prejudice, she identified herself as a Rebel, and she described a "South Burlington Rebel" as a student who is passionate and not afraid to stand up for what he or she believes. A third board member indicated that South Burlington's schools were known around the state for their openness and diversity, and he described how the name "Rebels" had been used by the schools to build both individual and group strength in students. Another member expressed the opinion that the people of South Burlington could legitimately celebrate the Rebel name for its connotations of questioning authority, nonconformity, and standing up for one's own opinions, and he declared that racists and bigots should not own the word "Rebels." The board chair observed that decisions had been made over twenty years ago to ensure that the Rebel name would not be associated with the Confederacy. At the conclusion of the discussion, the board chair announced the board's "general consensus" to keep the name but asked the superintendent of schools for the School District to come up with suggestions for "rebranding" the name to avoid confusion that the school district somehow endorsed the Confederacy or the enslavement of African Americans.

Fifteen months later, in a memo dated January 18, 2017, the superintendent of schools presented five options in response to the School Board's request for recommendations for "rebranding" the "Rebels" name to ensure that it remained positive and could not be understood as an endorsement of the Confederacy or of slavery.[4] None of these options included eliminating the Rebels' name. The Board took no action on these options at the meeting.

January 30, 2017, was the deadline for any South Burlington resident to put his or her name on the annual meeting ballot as a candidate for a seat on the School Board. Two days later, on February 1, 2017, the School Board met to again consider the "Rebels" name. An unusually large number of residents were in attendance, and the *Burlington Free Press* live streamed the meeting. At this meeting, the superintendent gave the Board a memorandum, dated that same day, in which he reported that he had given up on the "rebranding" options that he had presented two weeks earlier, and that he was now recommending that the "Rebel Identifier" be retired (Exhibit 3). The superintendent gave his memorandum only to the Board; he did not provide copies to those members of the public who attended the meeting.

---

[3] Neither party submitted to the court copies of the minutes of any school board meetings. Therefore, the court must accept as true the Plaintiffs' description of what occurred at the meetings.

[4] The options included: (i) a community developed definition of what it means to be a South Burlington Rebel in all school programs and publications; (ii) briefing middle and high school social studies classes on this situation and issues related to the inappropriateness of Confederate imagery in today's society; (iii) since South Burlington schools had no mascot, each school or graduating class would identify its own Rebel mascot; (iv) schools would have a "Rebel of the Quarter/Month theme program," identifying historical figures representing positive ideals; (v) the high school would offer an elective social studies course called "Rebels, Heroes, and Activists" focusing on modern and historic rebels.

In his memorandum, the superintendent explained that his recommendation to retire the "Rebel" name was based on: "stories shared by students, staff, and families; training and learning we've been doing as a staff; a series of local and national events; research from the American Academy of Pediatrics on the impact of racial bias on children as well as a study done by Pew Research recently on race relations" (Id.). The superintendent also recounted the results of staff and student surveys that he had conducted, showing that one-third of staff members and 8% of students were "uncomfortable" with the Rebel name. The superintendent concluded: "We know biases exist in our world and – as difficult as it is to admit – in our schools and community…. Additionally, many of our students have spoken up and made clear that the Rebel identifier feels exclusive and not inclusive to them" (Id.).

The Board voted that same day to eliminate the "Rebels" name. At no time before February 1st had the Board informed the public that it was contemplating taking that action.[5] Had the Board notified the public of its intention beforehand, those residents of South Burlington who supported keeping the name could have placed their names on the ballot for the upcoming March school board election, or they could have presented a petition for a public vote on the matter before the February 1st meeting. There is evidence that the Board's failure to inform the public of its intention beforehand was intentional; the superintendent of schools subsequently acknowledged to a South Burlington resident that he and the Board had deliberately not publicized the Board's intention to eliminate the name because the action was unpopular and the Board wanted to avoid a divisive debate.

After the Board's action became public, more than 700 South Burlington School District voters signed the petition at issue in this case, asking the School Board to place before the voters for a district-wide vote the ballot question "[s]hould the name of all South Burlington School District sports teams be the 'South Burlington Rebels' and should the South Burlington City Council and South Burlington School Board be required to make official, retain, and maintain this name for all South Burlington School District sports teams?" The signers represented more than 5% of the eligible voters. Plaintiffs were among those who signed the petition. On May 10, 2017, the Board denied the petition.

---

[5] This issue is particularly disputed by the parties. The School Board contends that the public knew or should have known that the issue whether to keep or eliminate the "Rebels" name would be addressed at the February 1st meeting. Defendant's contention may well be true; indeed, the unusually large number of residents in attendance, coupled with the fact that the event was live streamed, support the contention. As noted earlier, however, because the court has before it a motion to dismiss, the court must accept the Plaintiff's contentions to the contrary as true. It is also worth noting that the Defendant has not provided the court with a copy of any hearing notice or other document expressly stating that the question whether to keep or eliminate the name would be addressed at the February 1st meeting.

<u>Discussion</u>

The issue before the court is whether the School Board's refusal to place the name change question on the ballot for an advisory public vote in response to the petition violated the right to "instruct" clause contained in Chapter I, Article 20 of the Vermont Constitution. Although this provision has been part of Vermont's Constitution since 1777, the Vermont Supreme Court has never had an opportunity to construe the meaning or scope of Article 20's right to "instruct" clause. Because this is a case of first impression, the court will follow, to the extent possible, the approach set forth in <u>Baker v State</u>, 170 Vt. 194, 206 (1999) for construing Vermont's Constitution: "We typically look to a variety of sources in construing our Constitution, including the language of the provision in question, historical context, [and] case-law development...."[6]

*The Text.*

Article 20 provides that "the people have a right to assemble together to consult for their common good – to instruct their Representatives – and to apply to the Legislature for redress of grievances, by address, petition or remonstrance." This provision is related to Article 6, which provides: "[A]ll power being originally inherent in and co[n]sequently derived from the people, therefore, all officers of government, whether legislative or executive, are their trustees and servants; and at all times, in a legal way, accountable to them." Both provisions appear in Chapter I, which is Vermont's "Declaration of the Rights of the Inhabitants of the State of Vermont." Chapter II of the Constitution declares these rights "to be part of the Constitution of this Commonwealth," and it stipulates that these rights "ought not to be violated on any pretence whatsoever." Vermont Constitution, Ch. II, § 71.

Taken together, the plain intent of these provisions is to give to the people of Vermont the following fundamental political rights: (1) the right "to assemble together to consult for their common good;" (2) the right "to instruct their Representatives," who are their "trustees and servants" and "at all times, in a legal way, accountable to them;" and (3) the right "to apply to the Legislature for redress of grievances, by address, petition or remonstrance." The clear purpose of these rights is to assure that the people will have the opportunity to play a central role in determining what is in their own best interests, that their elected representatives will know what their constituents expect of them, and that the Legislature will be available to redress grievances. There are no other provisions of the Constitution that appear to contradict this interpretation of Articles 6 and 20.[7]

---

[6] <u>Baker</u> listed two other potential sources for construing the Constitution ("construction of similar provisions in other state constitutions, and sociological materials" ), but neither the parties nor the court has found helpful information from these sources.

[7] There are other articles in Chapter I of the Constitution that appear to support this interpretation. See, for example: Article 5 ("[T]he people ... by their legal representatives, have the sole, inherent, and exclusive right of governing and regulating the internal police of the same."); Article 7 ("[G]overnment is, or ought to be, instituted for the common benefit, protection, and security of the people ... and ... the community hath an indubitable, unalienable, and indefeasible right, to reform or alter government, in such manner as shall be, by that community, judged most conducive to the public weal."); Article 8 ("[A]ll voters, having a sufficient, evident, common interest with, and attachment to the community, have a right to elect officers,

The Legislature has enacted laws expressly designed to protect these rights and achieve these goals, including, for example, the "Vermont Open Meeting Law" (1 V.S.A. §§ 310, *et seq*.) and Vermont's "Public Records Act" (1 V.S.A. §§ 315, *et seq*.). The Legislature has also required municipal authorities to notify ("warn") voters in advance of the dates of, and matters to be voted on at each annual and special meeting (17 V.S.A. §§ 2640, *et seq*.). One such law, 17 V.S.A. § 2642(a)(3)(A), provides that "[t]he warning shall also contain any article or articles requested by a petition signed by at least five percent of the voters of the municipality and filed with the municipal clerk not less than 47 days before the meeting."[8] Although these sections from Title 17 do not specifically reference Article 6 or 20 of the Constitution, they provide, obviously, a mechanism by which voters can "assemble together" and "instruct their Representatives."

*Historical Context*[9]

The use of "instructions" dates back to England, where borough meetings gave voters an opportunity to learn about and debate the pressing issues of their day and, through their common councils, provide instructions to their members of Parliament. Christopher Terranova, *The Constitutional Life of Legislative Instructions in America*, 84 N.Y.U. L. Rev. 1331, 1334–36 (2009). During the colonial period in America, the English practice was continued and expanded, especially in New England, where town meetings gave colonists an opportunity to gather, debate issues of importance, and provide instructions to their colonial representatives. In 1764, for example, Boston issued to its newly elected representatives in the Massachusetts colonial legislature, instructions drafted by Samuel Adams to "guide[] [them] during the year's legislation." Adams' instructions reminded the town's representatives that "the people had delegated to them the power of acting in their public concerns in general" but had reserved "the right of instructing them upon particular matters." Id., 1337–38. The following year, John Adams drafted the famous Braintree Instructions, by which the voters of Braintree, Massachusetts instructed their representatives in the legislature to oppose the Stamp Act. Adams' draft, which was copied and used by dozens of other towns, said "we, the freeholders and other inhabitants, legally assembled for this purpose, must enjoin it upon you, to comply with no measures or proposals for countenancing the [Stamp Act], or assisting in the execution of it, but by all lawful means … to oppose the execution of it, till we can hear the success of the cries and petitions of America for relief." Id., 1338, n.44.

---

and be elected into office, agreeably to the regulations made in this constitution."); Article 9 ("[N]or are the people bound by any law but such as they have in like manner assented to, for their common good…."); and Article 13 ("[T]he people have a right to freedom of speech, and of writing and publishing their sentiments, concerning the transactions of government….").

[8] See also 17 V.S.A. § 2643(a), which provides that the legislative body of a municipality "shall call a special meeting on the application of five percent of the voters."

[9] "When neither constitutional text nor precedent affords guidance, sometimes a 'page of history is worth a volume of logic.'" Howard Jarvis Taxpayers Assn. v. Padilla, 363 P.3d 628, 638 (Cal. 2016) (quoting New York Tr. Co. v. Eisner, 256 U.S. 345, 349 (1921) (majority opinion of Associate Justice Oliver Wendel Holmes)).

An early example of the use of instructions in Vermont occurred in June of 1776, when the Cumberland (now Windham) County committee of safety met in Westminster and issued instructions to the county's delegates in the New York Provincial Congress on several issues, including "to use your influence to establish a Government in this Colony agreeable to this maxim, (viz.) that all Civil Power (under god) is Originaly in the People, and that you in no instance in your publick Capacity will do any thing to abridge the people of this fundamental right."  "Instructions for the Delegates of Cumberland County," Journal of the Cumberland County Committee of Safety, reprinted in Walton, E.P., ed. *Records of the  Council of Safety and Governor and Council of the State of Vermont* (8 vols.) (Montpelier, Vt.: Steam Press of J. & J.M. Poland, 1873-1880), 1: 348-50.

Following the Declaration of Independence, the states began adopting constitutions of their own.  The Pennsylvania and North Carolina constitutions of 1776 each included an "instruction" clause paired with the right to assemble, using language later copied almost verbatim by Vermont (1777), Massachusetts (1780), New Hampshire (1784) and several other states.  Akhil Reed Amar, *The Bill of Rights as a Constitution*, Yale L. J. 1131, 1154 (1991).  The pairing of the two provisions makes perfect sense because, obviously, it is impossible for any electorate to instruct its representatives if it cannot assemble together in some fashion.

After adoption of the Articles of Confederation, state legislatures routinely sent instructions to their delegates in the Continental Congress, even though the Articles did not contain explicit provisions giving them the right to instruct delegates; the right was simply assumed.[10]  Kris K. Kobach, *May "We the People" Speak?: The Forgotten Role of Constituent Instructions in Amending the Constitution,* 33 U.C. Davis L. Rev. 1, 53 (1999).  Because Vermont was not a state during this period (Vermont became a state in 1791), Vermont did not have a delegate in Congress during this period, but Vermont did send agents to Congress on several occasions with instructions to "vindicate [Vermont's] rights to independence" and "use all due diligence to remove every obstacle to the accession of this State to the Federal Government," among others. *State Papers of Vermont*, 3(1): 85; Walton, *Governor and Council*, 3: 447.  In the meantime, Vermont's citizens continued to assemble in town meetings and issue instructions to their representatives.[11]

Upon Vermont's admission to the Union in 1791, Vermont expanded its practice of "instructing" to include sending instructions to its representatives in the U.S. Congress, even though the U. S. Constitution did not include a right to instruct.  In September of 1795, for example, a county convention, representing eight towns on the west side of the Green Mountains, was held in Shaftsbury to debate the treaty that John Jay had just signed with Great Britain; the convention voted to instruct Vermont's west-side

---

[10] The Articles did contain a provision giving states the right to recall and replace their delegates to the Continental Congress.  See The Articles of Confederation, Art. V.

[11] See, for example, "An Address to the Freemen of Vermont," by Gov. Thomas Chittenden, published in the *Vermont Gazette,* August 28, 1786, reprinted at *Governor and Council*, 3: 359-361, advocating for the creation of a land bank, and urging Vermonters to contact their legislators and give them "such instructions as you may think proper."

representative in Congress that Bennington County considered the treaty "injurious to the interest and derogatory to the honor of the United States." See Resolutions of the Bennington County Convention of September 30, 1795, excerpted at Walter Hill Crockett, *Vermont, the Green Mountain State* (5 vols.) (New York: Century History Company, 1921-1923), 2: 541-42.

Hence, during the time when Vermont's Constitution was adopted in 1777 and extensively amended in 1786, it was common practice for constituent bodies to instruct their elected representatives on specific issues of concern. This principally occurred at the municipal level when the voters gathered every year at special and regular town meetings. The process used then was later described elegantly by the 1856 Council of Censors: "There [in town meetings] men discussed their rights and prepared to maintain them; there and there only they could vote in the aggregate; there, express their sentiments on all subjects touching the general interest; there, give instructions to Delegates and perpetuate the same by record; and in all these particulars, towns, as such, should be no less the object of special regard now." Journal of the Council of Censors, January 1856, reprinted in Paul S. Gillies and D. Gregory Sanford, eds., *Records of the Council of Censors of the State of Vermont* (Montpelier, Vt.: Offset House, 1991), at 608.

Throughout the nation, and especially in New England, instructions were given on a wide range of subjects, including not only political and constitutional matters but also education, morality, commerce, taxation, debt, the military, and slavery, among others. Instructions typically originated with the constituents, but instructions were also often requested or solicited by representatives themselves, when they needed clarity about where their constituents stood on an issue or support for a position they intended to take. Kebach, *May "We the People" Speak?*, 33 U.C. Davis L. Rev. at 28–58.

Moreover, representatives generally understood that, unless the language of the instructions indicated otherwise, instructions were binding and compliance with them was obligatory. If a representative disagreed with his instructions, he was expected to accede to them anyway or resign. However, because constituent instructions were not judicially enforceable, there were no formal legal mechanisms available by which an electorate could compel its representatives to comply with their instructions. The electorate's remedy for noncompliance was to vote the representative out of office at the next election. Id., 30–31.[12]

The historical context, out of which Article 20's "right to instruct" clause was adopted by Vermont's founders, both confirms and fleshes out the court's interpretation of the text's plain meaning. The public's right "to instruct their Representatives" is paired with, and dependent upon their right "to assemble together to consult for their common good." Voters could and did instruct their representatives on an almost unlimited range of subjects. Moreover, as the term implies, instructions were understood to be binding

---

[12] The United States Supreme Court has also concluded that constituent instructions historically were not judicially enforceable. Cook v. Gralike, 531 U.S. 510, 520–21 (2001) ("This evidence falls short of demonstrating that either the people or the States had a right to give legally binding, *i.e.*, nonadvisory, instructions to their representatives....").

and obligatory, in the absence of wording suggesting otherwise, but they were not judicially enforceable. If the representative failed or refused to comply with the voters' instructions, the only remedy available to the electorate was to vote him out of office at the next election.

Much has changed since Article 20 was adopted in 1777; at the time of the State's founding, for example, municipal voters relied almost entirely on town meetings by which to assemble and instruct their representatives,[13] whereas today, in cities like South Burlington, which do not hold traditional town meetings, municipal voters must instead rely on ballot initiatives. But this is a distinction without a difference – although the methods have evolved over time, the Constitutional rights to assemble and instruct remain unchanged.

*Case Law Development*

The Vermont Supreme Court has had only three opportunities to consider Chapter I, Article 20 of the Vermont Constitution. None of those cases dealt specifically with Article 20's "right to instruct" clause. Nevertheless, two of them are relevant here.[14]

In In re Petitions of Davenport, et al., 129 Vt. 546 (1971), the Hartford School Board fired a high school teacher for "conduct unbecoming a teacher" because of her involvement in an unauthorized student walk out. She had helped draft a petition addressed to the school board seeking permission for faculty and students to be released from class so that they could attend a symposium and demonstration against the Vietnam War and events in Cambodia. The Court held that the teacher's firing was unconstitutional because it infringed upon her right to petition the government for the redress of grievances guaranteed by the First Amendment to the U.S. Constitution and safeguarded by Article 20 of the Vermont Constitution. Id. at 559. The Court noted the fundamental importance of "the right of petitioning with impunity," and added, "although the subject of a petition may deviate from the views of others or may engender controversy, we must bear that risk." Id.[15]

The Court addressed Article 20's "right to assemble" clause in Clift v. City of South Burlington, 2007 VT 3, 181 Vt. 571 (mem.). There, the South Burlington city council

---

[13] The ballot initiative options set forth in 17 V.S.A. §§ 2642 and 2643 were not enacted into law until much later. Public referendums, on the other hand, were frequently held at the time of the State's founding, although they were initiated by the legislature, not the voters. See, for example: the General Assembly's March 1778 order submitting the question of annexing several New Hampshire towns to a state-wide referendum (*State Papers of Vermont,* 3(1): 9); the October 1784 order calling for a public referendum on the so-called Betterment Act (*Id.* 3(3): 109-110); and the October 1786 order submitting to the voters whether to enact a land bank, among other things (*Governor and Council,* 3(3): 365-66).

[14] In the third case, Kimbell v. Hooper, 164 Vt. 80 (1995), the Court held that Vermont's lobbyist disclosure law did not on its face violate the guarantees of petition, expression and assembly contained in the First Amendment to the U.S. Constitution and in Articles 13 and 20 of the Vermont Constitution.

[15] The Court affirmed the firing of two other teachers, however, because they had been insubordinate in refusing to comply with orders from the principal to return to class. Id. at 560–64.

denied a petition, signed by more than five percent of the city's voters, asking the city council to include in its 2005 town-meeting warning the following advisory article: "Shall the City of South Burlington … advise the City Council to ask our state legislators … to enact legislation that will protect young girls by requiring clinics to notify at least one parent prior to providing a surgical or chemical abortion to their minor daughter…." The city council refused to submit the petitioned article to the voters because it did not concern city business, and the petitioners appealed claiming that the city had violated their statutory rights under 17 V.S.A. § 2642(a) and their constitutional rights under Article 20. The Court rejected both of the petitioners' claims.

The Court's discussion focused mainly on the petitioner's statutory claim. The Court noted that its prior rulings under the statute had "consistently held that municipalities must have some discretion over the issues that are presented to voters at town meeting." Id. ¶ 6. More specifically, the Court held that § 2642(a) "provides municipalities with discretion over whether to present an article to voters … when it does not at all relate to municipal business or any matter falling within municipal authority." Id. ¶ 8. The Court concluded:

> Here, petitioners requested a town-meeting vote on an issue wholly outside the purview of the City and its voters. Neither South Burlington's voters nor its city council are required to advise the Legislature on a bill pending at the State House. While the City could have warned the advisory article and presented it to voters, it was under no obligation to do so. To decide otherwise would be to subject the town meeting – a forum primarily for conducting municipal business – to debate on every social issue of interest to voters. Allowing the City discretion to warn advisory articles, such as the one presented by petitioners, furthers the Council's ability to balance the efficient transaction of city business with the provision of a local forum for discussing state and national issues.

Id. ¶ 7.

The Court then took up the petitioners' constitutional claim in the last paragraph of its decision, as follows:

> As a final matter, we briefly consider petitioners' argument that the City's action in refusing to warn the advisory article was a violation of petitioners' right to assemble under Chapter I, Article 20 of the Vermont Constitution. Petitioners offer no legal authority for their claim. On the contrary, they admit that they lack case law to support their position and rely on faulty reasoning to reach the conclusion that a town-meeting vote on a petitioned advisory article is a constitutional right. Petitioners reason that because Chapter I, Article 20 "has

10

remained unchanged for 229 years" and within that time, use of the nonbinding, advisory article "has been a regular feature of town meeting," there must exist a constitutional right to a town-meeting vote on petitioned advisory articles. One does not necessarily have anything to do with the other, however, as Vermont municipalities have historically had the discretion to present advisory articles to voters. Thus, we are unpersuaded by petitioners' constitutional claim.

Id. ¶ 9.

These cases highlight important differences between the right in Article 20 to petition the legislature for redress of grievances and the right in Article 20 to assemble. A person has a right to petition the legislature "with impunity" and cannot be punished for doing so, no matter how controversial or objectionable the person's views may be to governmental authorities. In re Petitions of Davenport, 129 Vt. at 559. Article 20's right to petition "the Legislature" for the redress of grievances applies to school boards, who not only administer the school districts but also serve as their legislative bodies. See 16 V.S.A. § 563(15) ("The school board of a school district ... [s]hall exercise the general powers given to a legislative branch of a municipality.").

Where 17 V.S.A. §§ 2642(a) and 2643(a) are used as a means to "assemble" the electorate to vote on an advisory article at a town meeting, as is the case here, however, municipal authorities may deny the request, without violating Article 20's right "to assemble" clause, if the request "does not at all relate to municipal business or any matter falling within municipal authority." Clift, 2007 VT 3, ¶ 8. Because the Article 20 right of the people "to instruct their Representatives" is paired with and dependent upon their right "to assemble together to consult for their common good," it would appear that a school board's refusal to warn an advisory article would not violate the "instruction" clause of Article 20, either, if the article does not at all relate to school district business or any matter falling within school district authority.

*Contentions of the Parties*

Plaintiffs contend that the School District deprived them and other South Burlington voters of their constitutional "right to instruct their Representatives" on the School Board and City Council when the District refused to submit to voters at the City's annual meeting their ballot question "[s]hould the name of all South Burlington School District sports teams be the 'South Burlington Rebels' and should the South Burlington City Council and South Burlington School Board be required to make official, retain, and maintain this name for all South Burlington School District sports teams?" Because South Burlington does not have a traditional town meeting, where voters assemble together to discuss and decide issues of importance to them, Plaintiffs contend that they must have a constitutional right to use 17 V.S.A. § § 2642(a) and 2643(a) to put voter-initiated items on the ballot at the City's annual meetings. Otherwise, their rights under Chapter I, Article 20 could be rendered meaningless by school and city officials who disagree with the substance of their initiatives. Without this right, Plaintiffs claim that the people of

South Burlington "are silenced" ("Plaintiff's Objection to Motion to Dismiss," filed October 20, 2017, at 16).

This court agrees. Vermont's Constitution gives to the people of South Burlington the following fundamental political rights: the right "to assemble together to consult for their common good;" and the right "to instruct their Representatives," who are their 'trustees and servants" and "at all times, in a legal way, accountable to them. Vt. Const. Chapter I, Articles. 6 and 20. The clear purpose of these rights is to assure that the people of South Burlington will have the opportunity to play a central role in determining what is in their own best interests and that their elected representatives will know what their constituents expect of them. Vermonters have been exercising these rights since before the Declaration of Independence, and they continue to do so today. Because instructions from the voters are not judicially enforceable, elected officials can refuse to follow them; but this does not mean that officials can deny the electorate the opportunity to instruct them in the first place, on matters of concern to the voters. As noted earlier, the Vermont Constitution declares public officials to be the "servants" of the people; masters cannot be denied their rights at the whim of their servants, nor can servants deny their masters the opportunity to instruct them.

In South Burlington, the only way the electorate can assemble to instruct their representatives on the School Board and City Council is by calling for a special meeting, or by petitioning to add ballot items to annual and special meetings called by the School Board, pursuant to 17 V.S.A. §§ 2642(a) and 2643(a).[16] While it is true that members of the voting public can and often do attend and speak at South Burlington School Board meetings, including meetings where the "Rebel" name was discussed, those individuals can only express their personal views at such meetings; they cannot vote or speak as the "electorate."[17] The Plaintiffs in this case fully complied with those statutory requirements for adding an initiative to the ballot. By denying the Plaintiffs' petition, Defendant made it impossible for the electorate to instruct the School Board and City Council on the question whether to keep or retire the "Rebels" name, a question that is of purely local concern. Because the article that Plaintiffs asked to be added to the ballot related to school district business and fell within school district authority, Defendant violated Chapter I, Article 20 when it refused to include it on the annual meeting ballot.

The case of Baird v. Town of Berlin, 126 Vt. 348 (1967) supports this court's conclusion that the South Burlington School Board had no choice but to comply with Plaintiffs' petition to put the "Rebel" name on the ballot. In Baird, the Berlin Town school district received a petition signed by five percent of the voters asking the district to call a special meeting for the purpose of reconsidering a vote that had passed at the 1966 town

---

[16] This conclusion is consistent with the South Burlington City Charter, which provides that "[t]he annual City meetings of the City and the South Burlington School District for the election of officers, the voting on the budgets, and any other business included in the warnings for the meetings, shall be on a date established and legally warned by the Council" and "the voting on all questions shall be by Australian ballot system." 24 app. V.S.A. ch. 13 § 502(a) and (b).

[17] For purposes of school districts, the "electorate" is defined as "the qualified voters in a school district voting at a properly warned school district meeting." 16 V.S.A. § 11(a)(2).

12

meeting to purchase a 25-acre parcel of land on which to construct a new school. When the school district scheduled the requested special meeting, another group of voters sued to enjoin it. The Vermont Supreme Court dismissed the suit because, under the statutes in force at the time (the predecessors to 17 V.S.A. §§ 2643(a) and 2661(b)), the school district had had no choice but to call the requested special meeting, and because a properly warned election should not be enjoined except in extraordinary cases. Id. at 354–55. The Court said:

> Here, we have a petition of certain voters filed with the clerk of the town and town school district requesting that a special meeting be warned for the purpose of reconsidering the vote of June 6, 1966 authorizing the purchase of the Pike land. The selectmen, under the circumstances shown in this case, had no option as to whether or not they would warn the meeting requested. The language of 24 V.S.A. § 704 makes it mandatory that the selectmen act on the petition by warning the meeting requested and indicate the business to be transacted.

Id. at 354.

This court's conclusion is also supported by the language of the statutes under which the "Rebel" name petition was presented to the School Board. Section 2642(a)(3)(A) of Title 17 states that annual meeting warnings "*shall* also contain any article or articles requested by a petition signed by at least five percent of the voters...." (emphasis added). Section 2643(a) similarly provides that "[t]he legislative body ... *shall* call a special meeting on the application of five percent of the voters" (emphasis added). Use of the word "shall" suggests that the Legislature intended the provisions to be mandatory, not discretionary. Moreover, § 2643(c) states that "[t]he legislative body may rescind the call of a special meeting called by them *but not* a special meeting called on application of five percent of the voters" (emphasis added). Thus, when five percent of the voters ask for a special meeting, the school district must call the meeting and cannot rescind the call. Because these statutes provide the only means by which the electorate of the South Burlington School District can assemble and instruct their representatives, compliance with them is constitutionally mandated. See Putter v. Montpelier Public School Sys., 166 Vt. 463, 468 (1997) ("The United States Constitution protects the rights of all qualified citizens to vote in state and federal elections ... and to have their votes counted without debasement or dilution." (citation omitted)).

Defendant contends that the Vermont Supreme Court's decision in Clift v. City of South Burlington requires the dismissal of Plaintiff's Complaint in this case because of Clift's holding that the "right to assemble" under Article 20 does not create a constitutional right to require the City to warn and hold a vote on a petitioned advisory article ("Supplemental Memorandum in Support of Motion to Dismiss," filed October 20, 2017, at 2 and 11). The court disagrees. Clift is clearly distinguishable from the case at bar. In Clift, the question sought to be voted on (whether the State Legislature should pass a law requiring parental consent before their minor daughter could be given an

abortion) was unrelated to municipal business or matters falling within municipal authority. Here, however, the question sought to be voted on (whether South Burlington should keep or retire the "Rebel" name for its school sports teams) clearly is related to the business of the school district and clearly is within the district's authority.

Shifting gears, Defendant next argues that a line of cases, beginning with Royalton Tax Prot. Assn. v. Wassmansforf, 128 Vt. 153 (1969), precludes granting Plaintiffs the relief requested in their Complaint. Wassmansdorf and its progeny stand for the proposition that 17 V.S.A. § 2642 and 2643(a) cannot be used to compel municipal authorities to call a special meeting "for a useless, frivolous or unlawful purpose." Id. at 160. In Wassmansdorf, twelve percent of the voters asked the Royalton selectboard to call a special meeting for the purpose of changing the grand list, which the town listers had signed and filed, and to substitute some other body than the listers to develop a fairer method of appraising property tax values. Id. 157, 159–60. Neither action could lawfully be taken by the voters, however, because the power to make appraisals and sign grand lists was vested by law solely in the town's listers. Id. 158–59. The Court concluded that it would be pointless to hold the special meeting because, if the voters met and approved the proposed measures, "the resulting vote would be nugatory, unavailing and void of any determination of right." Id. 160. Therefore, the selectboard was not required to call the meeting.

The Court has followed Wassmansdorf in several other cases. See: Whiteman v. Brown, 128 Vt. 384, 388 (1970) (holding that a special school district meeting, requested by five percent of the voters for the purpose of instructing the school district to hire a CPA firm to audit the district's financial records, did not have to be called because "[t]he requested article both substantially differs from and clearly outreaches the authorization given in the … statute" governing the employment of outside auditors); Brewster v. Mayor of Rutland, 128 Vt. 437, 440 (1970) (upholding the mayor's refusal to call a special meeting, requested by twenty percent of the voters for the purpose of opposing the citing of a 75-unit low income housing project in their neighborhood, because the Rutland Housing Authority had "exclusive authority in the field of law income housing" and was not a department of the city); and Town of Brattleboro v. Garfield, 2006 VT 56, ¶ 12, 180 Vt. 90 (upholding the Brattleboro selectboard's refusal to hold a special town meeting, at the request of five percent of the voters to fill a vacancy on the selectboard, because the town's charter required such vacancies to be filled by the selectboard itself, not by the electorate; because the voters lacked the authority to fill the vacancy, their petition "did not present proper business for a special meeting."). None of these cases addressed the constitutional right to instruct in Article 20.

Defendant's reliance on Wassmansdorf and its progeny is misplaced. The Plaintiffs in this case are not seeking to have the voters take an action that, under the law, can only be taken by someone else. To the contrary, Plaintiffs seek only an opportunity for the voters to instruct their own School Board to do something that the School Board clearly has the authority to do, namely, change the name of its sports teams back to the "Rebels." Defendant has failed to point out any provision of the South Burlington City Charter or the statutes governing school districts that would forbid the electorate from

14

advising their school board on what to name their children's sports teams. Allowing the voters to do so would not be useless, frivolous, or unlawful.

Defendant's next argument is that the School Board's actions should not be subject to judicial review because the School Board alone has the authority and the obligation to address issues concerning racial discrimination in the School District, and it must be left free to do so. Nowhere in their Complaint, however, do the Plaintiffs challenge the School District's authority to determine how best to address issues of racial discrimination, nor do they ask the court to second guess the School District's conclusion that the "Rebel" name should be retired on account of its alleged racial connotations. The only issue here is whether the School District violated the Constitution by denying the electorate an opportunity to weigh in on the issue. After the electorate has had its say, if the School Board still believes that the name should not be reinstated, nothing in any decision from this court will require otherwise.

Defendant next argues that the right of the people "to instruct their Representatives" under Article 20 cannot apply to school boards because school boards are legislative bodies, and Article 20 makes a clear distinction between "Representatives," who can be instructed, and "the Legislature," which can only be applied to "for redress of grievances, by address, petition or remonstrance." The court agrees that Article 20 makes a clear distinction between the rights to assemble and instruct representatives, on the one hand, and the right to petition the Legislature, on the other hand. The court also agrees that the School Board serves as the legislative body for the Defendant School District. This does not mean, however, that the South Burlington School Board is exempt from Article 20's "right to instruct" clause.

Under Article 20, any voter or group of voters who are aggrieved by an act or omission of the School District may, if they wish, apply to the School Board to redress their grievance. However, no individual voter or impromptu collection of voters can "instruct" the School Board; only the "electorate" (i.e., the voters as a whole acting pursuant to a duly warned town meeting) that voted the School Board into office can instruct the School Board. Thus, the School Board is subject to both provisions of Article 20; it can be instructed by its electorate, and it can be petitioned by individual voters. While it may be within the School Board's discretion to deny a voter the relief petitioned for, and although the School Board may also have the ability to disobey instructions from its electorate, the School Board cannot deny a voter his or her right to petition "with impunity" or deny its electorate the right to instruct it. Having received a petition signed by five percent of the voters in compliance with 17 V.S.A. § 2642(a), the School Board had no choice but to place the "Rebel" name issue on the ballot so that the electorate could instruct its elected officials on the issue.

In the alternative, Defendant argues that Plaintiff's Complaint must be dismissed because any right that the electorate might have under Article 20, to instruct the School Board or City Council on the "Rebel" name, is legally unenforceable. As Defendant puts it, "the remedy for voters dissatisfied with representatives who do not follow their 'instructions' is the next election, not the courthouse" (Supplemental Memorandum, at 11). Defendant's contention asks, in essence, whether Article 20 is self-enforcing (i.e.,

whether, standing alone, Article 20 provides rights to individuals that may be vindicated in a judicial action).

Defendant relies upon Buttolph v. Osborn, 119 Vt. 116 (1956), in support of this contention. In Buttolph, a majority of the voters of the town of Shoreham voted to instruct the Shoreham school board to reopen the town's high school, which the board had closed the year before. When the school board refused to comply with the vote, fourteen of the town's residents and taxpayers sued for a writ of mandamus to compel the school directors to comply with the vote and reopen the school for the ensuing year. The Vermont Supreme Court dismissed the petition on the grounds that the school board had acted within its statutory authority in deciding to close the high school, and there was no evidence that the board had acted in bad faith in reaching its decision. Id. at 123. The Court also noted that instructions, though often given by electorates, had never been held to be judicially enforceable against the instructed officials. Id. at 123. The Court concluded:

> The Shoreham high school has been closed by officials locally elected by the Town of Shoreham. The authority to do this came from the law, but the decision to do it was by a locally elected board. The voters of Shoreham have not been deprived of all control over the situation. They may, in due course, replace their school directors at the end of their respective terms, with others who advocate maintaining a high school and thereby achieve the end they wish. The matter is still in their hands.
>
> … With us, the remedy comes at the next election.

Id.

Thus, Buttolph stands for the proposition, already recognized above, that instructions by voters are not legally enforceable, even if the voters intended their instructions to be binding. The only remedy available to the electorate, for an official who refuses to comply with their instructions, is to vote the offending official out of office at the next election. However, Buttolph does not support the proposition that voters can be denied the right to instruct their representatives in the first place. That right comes from Article 20, a provision that the Court in Buttolph was not called upon to consider.

A provision of the Vermont Constitution is self-executing "if it supplies a sufficient rule by means of which the right given may be enjoyed and protected … and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given force of law. Shields v. Gerhart, 163 Vt. 219, 224 (1995). The Vermont Supreme Court has further explained that a "self-executing provision should do more than express only general principles; it may describe the right in detail, including the means for its enjoyment and protection." Id. Following these principles, the Court has concluded that Chapter I, Articles 4 (due process), 7 (common benefit) and 13 (freedom of speech) are all self-executing, whereas Articles 1 (right to

possess property) and 6 (declaring that all power is derived from the people) are not. See, for example, <u>Nelson v. Town of St. Johnsbury Selectboard</u>, 2015 VT 5, ¶¶ 42–54, 198 Vt. 277, and the cases collected therein.

The Vermont Supreme Court has never addressed whether Article 20, granting the people the rights to assemble and instruct their representatives, is self-executing or not. There is good reason to conclude that it is. Like Article 13's right of free speech, which has been held self-executing because "[i]t sets forth a single specific right of the people to make themselves heard, a fundamental characteristic of democratic government," <u>Shields</u>, 163 Vt. at 227, Article 20's right to assemble and instruct is also specific and of fundamental importance. Indeed, it would be hard to imagine anything more fundamental to a democracy than the ability of the people to assemble for the purpose of electing and instructing their representatives. Moreover, such rights would be illusionary if the people needed someone's permission to assemble and vote.

Nevertheless, this court does not need to decide whether Article 20 is self-executing for purposes of this case. This is because the Legislature has enacted statutes by which Article 20's rights to assemble and instruct may be given effect, namely, 17 V.S.A. §§ 2642(a) and 2643(a), and it was these statutes that Plaintiffs invoked when they submitted their petition to the South Burlington School Board. See <u>Welch v. Seery</u>, 138 Vt. 126, 128 (1980) ("Article 6 is but a truism of a republican form of government, and provides no right of action. The remedy contemplated by it is that of popular election…. The maxim embodied in Article 6 is nevertheless given effect through multifarious legislative enactments…."). Because 17 V.S.A. § 2642(a)(3)(A) provides a mechanism by which the voters of South Burlington can "assemble together" and "instruct their Representatives," Plaintiffs have a constitutionally protected right to avail themselves of it.

If the facts relied upon by the Plaintiffs are true, then a remedy is available to them under V.R.C.P. 75. This rule authorizes the court to review "[a]ny action or failure or refusal to act by an agency of the state or a political subdivision thereof, including any department, board … or officer" that is not appealable under V.R.C.P. 74, "if such review is otherwise available by law." Rule 75 is the "modern equivalent" of the old common law writs of extraordinary relief, such as mandamus, prohibition, and certiorari. <u>Garbitelli v. Town of Brookfield</u>, 2011 VT 122, ¶ 6, 191 Vt. 76. If a right to extraordinary relief is shown, and no other avenue of appeal is available, Rule 75(d) empowers the court to "affirm, reverse, or modify the decision under review as provided by law."

Because Plaintiffs ask the court to order the Defendant to put their ballot question to a vote by the electorate, Plaintiffs are seeking relief in the nature of mandamus. "Mandamus will ordinarily lie only 'to compel a public officer to perform an official act which is merely ministerial,' and only where 'the right sought to be enforced is certain and clear.'" <u>Alger v. Dep't of Labor & Industry</u>, 2006 VT 115, ¶ 15, 181 Vt. 309 (citing and quoting <u>Roy v. Farr</u>, 128 Vt. 30, 34 (1969)). The law recognizes the following exception to this rule: "[W]here there is 'an arbitrary abuse of power vested by law in an administrative officer or board which amounts to a virtual refusal to act or to perform a duty imposed by law, *mandamus* may be resorted to in the absence of other adequate

legal remedy.'" Alger ¶ 15; see, also, Vermont State Employees' Ass'n. v. Criminal Justice Training Council, 167 Vt. 191, 195 (1997) ("Mandamus ordinarily is not available to compel discretionary decisions.... The writ has been extended, however, to reach extreme abuses of discretion involving refusals to act or perform duties imposed by law." (citations omitted)).

If the facts relied upon by the Plaintiffs turn out to be true, then Plaintiffs would be entitled to an order in the nature of a writ of mandamus compelling the South Burlington School District to put Plaintiff's ballot question to a vote by the electorate. The District's duty to put Plaintiff's ballot question to such a vote is imposed by the Constitution and is certain, clear, and non-discretionary. See Baird v. Town of Berlin, 126 Vt. at 354 ("The selectmen, under the circumstances shown in this case, had no option as to whether or not they would warn the meeting requested. The language of 24 V.S.A. § 704 makes it mandatory that the selectmen act on the petition by warning the meeting requested and indicate the business to be transacted.").

"A motion to dismiss … is not favored and rarely granted." Alger, 2006 VT 115, ¶ 12 (citation omitted). This is especially true "when the asserted theory of liability is novel or extreme, as such cases "should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." Id. (quoting Ass'n of Haystack Prop. Owners, Inc. v. Sprague, 145 Vt. 443, 447 (1985); Felis v. Downs Rachlin Martin PLLC, 2015 VT 129, ¶ 12, 200 Vt. 465 (holding that a motion to dismiss will be upheld only if "it is beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief."). Because Plaintiffs have come forward with facts which, if believed, would entitle them to relief, Defendant's motion to dismiss must be denied.

Order

Defendant's Motion to Dismiss is DENIED. Within fourteen (14) days counsel shall agree upon and submit to the court a proposed scheduling order for expeditiously completing all remaining tasks in this case.

SO ORDERED this 12th day of December, 2017.

_____
Robert A. Mello
Superior Court Judge

18